## Case No. 11,192.

### PITTS v. HALL.

[2 Blatchf. 229;[1] 1 Fish. Pat. Rep. 441.]

Circuit Court, N. D. New York. June 19, 1851.

PATENTS — PRESUMPTION AS TO INVENTION — WHO IS INVENTOR — ABANDONMENT — PUBLIC USE — DEDICATION—SALE WITHIN TWO YEARS—METHOD OF COMPUTING DAMAGES FOR INFRINGEMENT.

1. The presumption of law is, that a patentee was the inventor of that which he patented, and the burden is thrown on the defendant to disprove the fact.

[Cited in Agawam Woolen Co. v. Jordan, 7 Wall. (74 U. S.) 597; Blanchard v. Putnam, 8 Wall. (75 U. S.) 426. Cited in brief in Locomotive Engine Truck Co. v. Pennsylvania R. Co., Case No. 8,453.]

[Cited in Slemmer's Appeal, 58 Pa. St. 162.]

2. A person, to be entitled to the character of an inventor, within the meaning of the act of congress, must himself have conceived the idea embodied in his improvement.

3. But, in order to invalidate a patent on the ground that the patentee did not conceive such idea, it must appear that the suggestions, if any, made to him by others, would furnish all the information necessary to enable him to construct the improvement completely and perfectly.

[Cited in Agawam Woolen Co. v. Jordan, 7 Wall. (74 U. S.) 603; Union Paper Bag Mach. Co. v. Pultz & Walkley Co., Case No. 14,392; National Feather Duster Co. v. Hibbard, 9 Fed. 561.]

4. An inventor may forfeit his right to an invention by using it publicly, or by vending

it to others to use, at any time prior to the period of two years before his application for a patent.

[Cited in McMillin v. Barclay, Case No. 8,-902; Consolidated Fruit Jar Co. v. Wright, 94 U. S. 94; Henry v. Providence Tool Co., Case No. 6,384.]

5. Such use must be a use by the patentee himself, publicly, in the ordinary way of a public use of a machine, and not a use for experiment or trial, with a view to test its operation or ascertain its defects.

[Cited in Jones v. Sewall, Case No. 7,495; Jennings v. Pierce, Id. 7,283; Manning v. Cape Ann Isinglass & Glue Co., Id. 9,-044; Smith & Davis Manuf'g Co. v. Mellon, 7 C. C. A. 439, 58 Fed. 707.]

6. A forfeiture of an invention is not favored in law; and, where a use is relied on as having worked a forfeiture, the evidence should be quite clear that the use was not by way of experiment, or for the purpose of perfecting the machine.

[Cited in Jones v. Sewall, Case No. 7,495; Jennings v. Pierce, Id. 7,283; Emery v. Cavanagh, 17 Fed. 243; Celluloid Manuf'g Co. v. American Zylonite Co., 26 Fed. 698; Andrews v. Hovey, 124 U. S. 705, 8 Sup. Ct. 678.]

7. An inventor may abandon his invention, or dedicate it to the public, at any time before procuring his patent.

[Cited in Andrews v. Hovey, 124 U. S. 705, 8 Sup. Ct. 678; Bevin v. East Hampton Bell Co., Case No. 1,379.]

8. But the mere use or sale of the invention by the patentee within two years before his application for a patent, will not alone or of itself work an abandonment. There must be, in addition, some declaration or act going to establish an intention on his part to give to the public the benefit of his invention.

[Cited in Bevin v. East Hampton Bell Co., Case No. 1,379; Jones v. Sewall, Id. 7,495; Anderson v. Eiler, 46 Fed. 780.]

9. Declarations of a determination not to take out a patent, but to let the public have the invention, will estop the party making such declarations, and any one holding under him, from afterwards asserting his right against one who acts on the faith of them.

10. But declarations of an intention to dedicate an invention to the public, will not be regarded as equivalent to an actual dedication. Besides words, there must be acts, in order to fasten on a patentee the intention which, in judgment of law, will work an abandonment of his invention.

11. Such an abandonment operates in the nature of a forfeiture of a right, which the law does not favor, and must be made out beyond all reasonable doubt.

12. In patent cases, the plaintiff is entitled to the actual damages he has sustained in consequence of the infringement of his patent, as contradistinguished from exemplary, vindictive and punitive damages.

[Cited in Mulford v. Pearce, Case No. 9,908.]

[Cited in El Modello Cigar Manuf'g Co. v. Gato, 25 Fla. 886, 7 South. 28.]

13. One mode of arriving at the damages is, to ascertain the profits which the plaintiff derives from the machines he makes and sells and which have been made and sold by the defendant.

14. Another mode is, to ascertain the profits which the party infringing has derived from the machines; but this measure of damages is not controlling, and the plaintiff is entitled to the profits he would have made if not interfered with.

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

15. The plaintiff is entitled to interest on the actual damages, from the commencement of the suit.

This was an action on the case [by John A. Pitts against Joseph Hall], tried before Mr. Justice NELSON and Judge CONKLING, for the infringement of letters patent [No. 4,595] granted to Daniel Carey, of Clarkson, N. Y., June 27th, 1846, for an "improvement in the horse-power." The plaintiff was assignee of the patent, for the state of New-York. The infringement alleged was the making and selling horse-powers containing the patented improvement. There was no dispute as to the identity of the defendant's machines with that patented.

[The claim of the patentee was as follows: Having thus fully described the manner in which I construct my horse-power, what I claim therein as new, and desire to secure by letters patent, is the special arrangement and combination of the gearing, as herein set forth; said gearing consisting of the single large wheel, A, driving two pinions, C, C, in the shafts of the two horizontal wheels, E, which horizontal wheels gear into the two pinions, J, J, on the line shaft, there being a bridge, G, to admit of the passage of the line shaft; the whole arrangement being substantially the same with that herein represented and made known.] [2]

Samuel Stevens and William F. Cogswell, for plaintiff.

Harvey Humphrey, Charles M. Keller, and Samuel Blatchford, for defendant.

NELSON, Circuit Justice (charging jury). As to the particulars of the improvement invented by Carey, we do not think it material to call your attention to them critically, because they are not in controversy. In very general terms we may say, that the invention is a new arrangement of the gearing of the horse-power, by duplicating it, and in this way distributing the power applied to the line or driving shaft, and diminishing the strain on any one part of it. It is admitted by the defendant that this arrangement of the gearing and distribution of the strain, in the operation of the machine, is new and useful, and the proper subject of a patent. The novelty of the improvement, therefore, which is a very important matter in most patent cases, need not embarrass your deliberations, in examining the questions growing out of this case.

This brings us to the first question arising upon the evidence, and that is, whether or not Carey, the patentee, was the first and original discoverer of the improvement. This is the most material question in the case, and the one that has been the most severely litigated. It is undoubtedly vital to the right claimed by the plaintiff, and, of course, it is one to which you will be obliged to turn your attention with some particulari-

ty. A good deal of evidence has been given by each of the parties, bearing on this question, both by deposition and by the examination of witnesses in court. Carey having obtained his patent from the government in June, 1846, the presumption of law is with him. He is, in the first instance, to be deemed the inventor, and the burden is thrown on the defendant to disprove the fact. This he has assumed, and he insists that the witnesses Daniel Fowler and Russell Bowers, one or both of them, were the first inventors of this peculiar arrangement, and that they made to Carey the first suggestions of the improvement, and of the particular combination embodied in the description of the patent. It is claimed, on the part of the defendant, that these witnesses prove that they made the first suggestions of this new arrangement to Carey as early as September, 1839, at a public house in Chili, Monroe county, where they were at the time, and where they met Carey. You recollect the drawings testified to by them as accompanying the explanations they made to him, and which they claim to have been the result of previous consultations between them about this improvement, with a view to perfect it. There is also the testimony of Leonard Hall, on this branch of the case. He states that, in the spring of 1846, he was present at this same public house, in Chili, in company with Carey and Bowers, and the subject of an improvement on the old horse-power came up, and Bowers mentioned to Carey and the witness his contemplated improvement on the machine, and took out some chalk and made a drawing on the floor and explained it.

In connection with the testimony of the two witnesses Bowers and Fowler, it is proper to call your attention to a circumstance which should be taken into the account when endeavoring to ascertain the credit and weight to which their testimony is entitled. It is, that Bowers purchased of Carey two machines containing the patented improvement, one in 1844 and one in 1845. And it appears that at this time, or at some previous time, when speaking of this improvement of Carey's, he recommended it highly, as being by far the best arrangement of the horse-power in public use, and stated, also, that he intended to have one or two of the machines before he went West. And, while thus speaking of the improvement and recommending it for its advantages, he did not pretend that he was the inventor or had suggested the arrangement to Carey. This circumstance is relied on to weaken the effect of his testimony. It is for the jury to say what effect it should have. He purchased two or three machines, and took them with him when he went West.

Another fact should be noticed in relation to the testimony of Fowler, the other witness. He wrote a letter, on the application of the plaintiff, giving an account of the part

[2] [From 1 Fish. Pat. Rep. 441.]

he had taken in getting up this improvement, and undertook to give a detail of the interview between him and Carey upon this subject. That letter was signed by Fowler, on the application of the plaintiff. The witness did not read it himself, but heard it read before he put his signature to it. It is insisted by the plaintiff, that the account he gave in this letter of the part he took in the improvement, and of the suggestions he made to Carey in getting it up, fell far short of the account he has given in his deposition, and that, for this reason, his testimony going to detract from the merit of Carey should be regarded with considerable allowance. It is for you to say to what credit the witness is entitled.

This is the substance of the proof put forth on the part of defendant, to rebut the presumption of law arising from the patent, in favor of the claim of Carey, and to show that he was not the original inventor, but, on the contrary, that he got up the improvement on the suggestion of Fowler and Bowers.

In answer to this view, it is claimed, on the part of the plaintiff, that Carey made the improvement himself, in the summer and fall of 1842 and the spring of 1843; that he was engaged for some time in the discovery and in making drawings and experiments with a view to perfect it; that the result was due to his ingenuity and labor bestowed on the subject; and that he actually constructed a machine in the spring of 1843, completed it in June of that year, and put it in operation in the course of the fall. It is insisted, therefore, for the plaintiff, that he has shown that Carey was the inventor of the arrangement which has turned out to be so highly useful and profitable. The witnesses relied on to maintain this view of the case are Shelton, the brother-in-law of Carey, and who witnessed the experiments and trials made by him, and has related the conversations had with Carey at the time; Howe, who lived in his family from 1842 to 1847, and has detailed his knowledge of these experiments and trials; and Peck and Thompson, who built the first machine in the spring of 1843.

Without going into the evidence with any more particularity, we shall leave this question with you. It is a simple question of fact, and its determination will depend upon the exercise of good sense and judgment and an attentive and critical examination of all the testimony in the case.

Now, there is no doubt that a person, to be entitled to the character of an inventor, within the meaning of the act of congress, must himself have conceived the idea embodied in his improvement. It must be the product of his own mind and genius and not of another's. Thus, in this case, the arrangement patented must be the product of the mind and genius of Carey, and not of Bowers' or Fowler's. This is obvious to the most common apprehension. At the same time, it is equally true that, in order to invalidate a patent on the ground that the patentee did not conceive the idea embodied in the improvement, it must appear that the suggestions, if any, made to him by others, would furnish all the information necessary to enable him to construct the improvement. In other words, the suggestions must have been sufficient to enable Carey, in this case, to construct a complete and perfect machine. If they simply aided him in arriving at the useful result, but fell short of suggesting an arrangement that would constitute a complete machine, and if, after all the suggestions, there was something left for him to devise and work out by his own skill or ingenuity, in order to complete the arrangement, then he is, in contemplation of law, to be regarded as the first and original discoverer. On the other hand, the converse of the proposition is equally true. If the suggestions or communications of another go to make up a complete and perfect machine, embodying all that is embraced in the patent subsequently issued to the party to whom the suggestions were made, the patent is invalid, because the real discovery belongs to another.

These are all the observations I shall trouble you with on the first branch of the case. It is an important question, and, in one aspect of the case, puts an end to the controversy. It is for you to say, after weighing carefully the whole evidence, who is entitled to the merit of this improvement—who invented and perfected it. I do not mean, who constructed the first machine, but who conceived and gave practical form and effect to the ingenious arrangement which constitutes the improvement engrafted on the old machine.

The next question in order, in the examination of the case, assuming that you may come to the conclusion that Carey was the inventor, is, whether or not he has forfeited his right to the invention, or has abandoned it to the public use. By the 7th section of the act of March 3, 1839 (5 Stat. 354), it is provided, that "every person or corporation who has, or shall have, purchased or constructed any newly-invented machine, manufacture or composition of matter, prior to the application by the inventor or discoverer for a patent, shall be held to possess the right to use, and vend to others to be used, the specific machine, manufacture or composition of matter so made or purchased, without liability therefor to the inventor, or any other person interested in such invention; and no patent shall be held to be invalid by reason of such purchase, sale or use prior to the application for a patent as aforesaid, except on proof of abandonment of such invention to the public; or that such purchase, sale or prior use has been for more than two years prior to such application for a patent." The right to an invention may be forfeited or abandoned in two ways: first, by using or vending the improvement more than two years prior to the appli-

cation for a patent; and secondly, by a dedication or abandonment of it to the public use. There may be an abandonment by the inventor at any time, even within the two years before the application for his patent.

In the first place, the patentee may forfeit his right to the invention if he constructs it and vends it to others to use, or if he uses it publicly himself in the ordinary way of a public use of a machine, at any time prior to the period of two years before he makes his application for a patent. That is, he is not allowed to derive any benefit from the sale or the use of his machine, without forfeiting his right, except within two years prior to the time he makes his application. In this case, the application by Carey was made on the 28th of April, 1846. The two years would extend back to the 28th of April, 1844, and the sale or use of the machine, in order to work a forfeiture of his right, must have taken place anterior to the latter period. It is not pretended that there was any sale of this improvement previous to that time; and but one machine had been previously constructed. But it appears that this machine was used by Carey in 1843, in the business of threshing. This, unexplained, would operate as a forfeiture of the right. It is claimed, however, that the machine was used in the fall of 1843 by way of experiment and trial, with a view to ascertain whether it would meet the expectations of the discoverer, and to enable him to ascertain any defects in its operation or construction, so that he could remedy them before the application for the patent. It is also claimed that there were defects, and that material alterations were made in the spring of 1844, in the construction of the second machine; that the two bevelled wheels driven by the bull pinions were too large, so large that they were obliged to be extended over the frame, which threw the gearing, and the arms to which the horses were attached, so high as to put the machine out of gear, by canting the machinery; and that, to relieve this defect, the two bevelled wheels were reduced in the spring of 1844, and dropped down within the frame, so as to lower the gearing and arms. It is insisted, therefore, that the use in the fall of 1843 was by way of trial, and that the experiments resulted in a change in the construction of the machine. No doubt the view presented, if you think it sustained by the evidence, explains satisfactorily this previous use, and prevents its working a forfeiture of the right of the patentee.

On the other hand, if the machine was complete when it was constructed in June, 1843, and if the patentee put it into public use, or put it in operation himself publicly, deriving profit from it, and having no view of further improvements or of ascertaining its defects, then, this use having occurred anterior to the two years, the effect would be to work a forfeiture. It is proper to say, however, that this ground of forfeiture is not favored in law, but is regarded as being somewhat harsh in its operation on individual rights. The evidence, therefore, should be quite clear, that the use was not by way of experiment, or for the purpose of perfecting the machine, in order to justify the conclusion that the patentee had forfeited his right to the improvement.

Then, as to the point of abandonment. This is a difficult question, although somewhat connected with the one to which we have been directing your attention. An abandonment or dedication may occur within the two years, and at any time down to the procurement of the patent. The mere use or sale, however, of the machine, within the two years, will not alone or of itself work an abandonment. There must be something more, because the 7th section of the act of 1839 permits the sale or use by the patentee at any time within two years before his application, without its operating to invalidate his right. The use or sale must be accompanied by some declarations or acts going to establish an intention on the part of the patentee to give to the public the benefit of his improvement. The question here is, whether there has been shown any such act or declaration of Carey's prior to April, 1846. If the evidence leads you to this conclusion, then there has been an abandonment which operates as a dedication of the invention to the public, and bars the claim of any one under the patent.

It is insisted, on the part of the defendant, that the patentee should be bound by his declarations; and evidence has been given that, on several occasions, he expressed a determination not to take out a patent, but to let the public have the invention. Undoubtedly, a person acting on those declarations, who has constructed a machine and put it in operation, would not be liable to the patentee, or to any one holding under him, for an infringement, because Carey, having led the defendant, by his declarations, to believe that he had a right to construct and put in operation the machine, without exposing himself to responsibility, would be estopped from afterwards denying the license thus given. But that is a different principle, and is founded on a different consideration, from the one that gives to these declarations of Carey's the effect of a dedication of the improvement to the benefit of the public. We think he is entitled to the locus penitentiæ, and that there must be something more than mere words, to fasten on him the intention which, in judgment of law, would work an abandonment of his invention. There must be acts. The invention is the property of Carey, as much as the stock on his farm, or the furniture in his house, and the mere expression of an intention not to take measures for the purpose of securing to himself the exclusive enjoyment of this property, or the mere declaration of an intention to dedicate it to the public, cannot be regarded as equivalent to

an actual dedication. This abandonment or dedication, too, operates in the nature of a forfeiture of a right, which the law does not favor, and which should be made out beyond all reasonable doubt.

The only remaining question is as to the damages. This assumes, in the first place, that you will find that Carey was the first and original inventor; and, in the next place, that he has not forfeited or abandoned his right to the public. The general rule is, that the plaintiff, when he has established a right to recover, is entitled to all the actual damages which he has sustained in consequence of the infringement of his patent, as contradistinguished from exemplary, vindictive and punitive damages. These are not to be taken into consideration in patent cases.

One mode of arriving at the actual damages is, to ascertain the profits which the plaintiff derives from the machines which he manufactures and sells, and which have been made and sold by the defendant. This mode is founded on the presumption of law, that if the defendant had not been wrongfully concerned in the manufacture of the machines, those persons who procured them from him would have applied to the patentee or assignee for them.

Another mode, and the one resorted to partially in this case is, to ascertain the profits which the party infringing has derived from the use of the invention or the construction of the machines; because, whatever profits he has derived have arisen from the wrongful use of the invention, and belong to the real owner of the machine. This measure of damages, however, is not controlling, and ought not to be; because, a party concerned in infringing a patent stands in a different position from the patentee, not having been previously subjected to the expense and labor to which the latter is frequently exposed in the process of invention, and experiment. Hence, the person who enters upon the business without previous expense, may very well afford to sell machines at less profit than the patentee. The latter must have his profit, not only for the expense of putting in operation the improvement, but by way of indemnity for the previous time, labor and money which he has been obliged to bestow on the invention. He must, therefore, charge a higher price, to cover these greater expenses. Thus, profits which the party infringing might be satisfied with, and which would afford him compensation, would not afford indemnity to the patentee. If, therefore, on looking into the profits made by the defendant, the jury shall be of opinion that they do not correspond with the fair profits which the plaintiff, if left alone, would have realized, they are not bound by the measure of the profits of the defendant, but have a right to look to the profits which the plaintiff or the patentee would have made under the circumstances, if not interfered with. It is admitted that the defendant made forty-two machines within the time for which the plaintiff is entitled to recover, if at all, and your inquiry will be as to the profits which the plaintiff would have derived from those machines if they had not been manufactured by the defendant. You will thus approximate to the actual damages which the plaintiff has sustained, and you will add interest from the commencement of the suit.

The jury found a verdict for the plaintiff, for $2,345.