Meyer PIET, an individual, and Future-craft Corporation, a corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 322–58.

United States District Court
S. D. California,
Central Division.

Sept. 8, 1959.

578

Gibson, Dunn & Crutcher, by Dean C. Dunlavey and Julian O. von Kalinowski, Los Angeles, Cal., for plaintiffs.

Laughlin E. Waters, U. S. Atty., by Richard A. Lavine, Asst. U. S. Atty., Los Angeles, Cal., and Albert K. Geer, Dept. of Justice, Washington, D. C., for defendant.

YANKWICH, District Judge.

Meyer Piet, to be referred to as Piet, and Futurecraft Corporation, a California corporation, to be referred to as Futurecraft, instituted this action against the United States on April 11, 1958, to recover compensation for use of an alleged invention represented by Letters Patent No. 419,471, entitled "System and Valve Mechanism for Rocket Propulsion". The application for the patent was filed on March 29, 1954. On the same day an assignment of the entire rights, title and interest in the application and the invention, as well as any letters to be granted, was made to Futurecraft. During the course of the examination of the patent in the United States Patent Office, on October 13, 1954, a secrecy order was imposed on the application and the invention by the Commissioner of Patents, acting in accordance with notification of the United States Army. The secrecy order was accompanied by a permit designating a limited number of persons in the Army and others to have access to the information contained in the application.

On June 21, 1956, the Patent Office notified the plaintiffs that the application containing twenty-six claims was in condition for allowance. However, the Patent Office withheld formal issue "during such period as the national interest requires" because of the secrecy order imposed on October 13, 1954. By this action plaintiffs seek to recover compensation for use by the Government of the invention and damages caused by the secrecy order.[1] Many proceedings have been had in the case. A motion to abate the action because of a claim of secrecy by the Secretary of the Army was de-

1. 35 U.S.C.A. § 183. In sustaining the Complaint in this case against a Motion to Dismiss I followed the decision of the Court of Appeals for the Second Circuit in Halpern v. United States, 1958, 258 F.2d 36.

nied.[2] Other proceedings, such as motions for summary judgment,[3] which were denied need not concern us because the Court ordered, on June 24, 1959, a separate trial[4] of the defense of invalidity of the patent in suit by reason of public use and sales for more than one year before the filing date of the application.[5]

This defense is available[6] to the Government under the express provision of the Statute under which this action is brought.[7] A separate trial was had on August 24, 1959. Before us is the determination of the fact whether the defense is made out. If it is, there is no issue to be tried, for, in such circumstances, even a summary judgment would be proper,[8] as the question of validity becomes one of law.[9] Counsel have stipulated in writing to the facts upon which the contention of the Government is based. In what follows we give a summary of the series of stipulations.

## I
### Agreed Facts

Claims numbered 3–13, 16–28 and 32–33 of the plaintiffs application Serial No. 419,471 have been allowed by the Patent Office. Each of the claims so allowed reads on one or more of the valves depicted in certain Futurecraft drawings designated as 9–1340, 10003 and 10005.

One or more of the claims allowed in the application also reads on the valve depicted in California Institute of Technology, Jet Propulsion Laboratory, drawing number 5–9908, which plaintiffs contend is plaintiffs' sole property.

The drawings and valves referred to are the only drawings and valves relied upon by the defendant in support of its defense that a valid patent cannot issue on plaintiffs' application number 419–471. Each of the valves depicted in Futurecraft drawings 9–1340, 10003, 10005 and JPL drawing 5–9908 was manufactured and sold by plaintiffs, for profit, not earlier than 1950 but prior to March 29, 1953, but only under the following circumstances:

All sales of the valves were solely to the United States Government, through prime contractors, in connection with work being done by the prime contractors on military defense projects under Government security classification. In particular, the following valves were sold to the Government by plaintiffs through the following prime contractors and were used solely for incorporation into the propulsion systems of the following military missiles or rockets, all of which were security classified as "Confidential" or higher at all times prior to March 29, 1954:

| 5–9908 | Jet Propulsion Laboratory | Corporal missile |
| 9–1340 | Firestone | Corporal missile |
| 10003 | North American Aviation | Cook research sled |
| 10005 | Aerojet-General Corp. | Bomarc missile |

2. 5 U.S.C.A. § 22; United States v. Reynolds, 1953, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727.

3. Rule 56(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

4. Rule 42(b), Federal Rules of Civil Procedure.

5. 35 U.S.C.A. § 102(a), (b) or (c).

6. 28 U.S.C.A. § 1498.

7. 35 U.S.C.A. § 183.

8. Magee v. Coca-Cola Co., 7 Cir., 1956, 232 F.2d 596; Syracuse v. Paris, 9 Cir., 1956, 234 F.2d 65; George P. Converse & Co., Inc. v. Polaroid Corporation, 1 Cir., 1957, 242 F.2d 116, 120; Gearon v. United States, 1954, 121 F.Supp. 652, 129 Ct.Cl. 315.

9. Hazeltine Research, Inc. v. General Motors Corporation, 6 Cir., 1948, 171 F.2d 680, 681. See cases cited in Note 8, supra.

The invention described and claimed in the plaintiffs' patent application 419,-471 has never been available for sale or on sale except to the Government through the aforesaid prime contractors for use in the aforesaid classified military rockets and missiles.

The JPL drawing 5–9908 was classified "Restricted" at all times prior to October 16, 1954, and to the present knowledge of the parties only personnel working on the Corporal missile program and having a Government security classification of "Confidential" or higher had access to or saw said drawing or the valve depicted therein prior to said date.

The Futurecraft drawings were not officially classified but were treated by plaintiffs, at all times, as though classified and bore the Futurecraft proprietary notices set forth thereon, and, to the present knowledge of the parties, no one anywhere had access to or saw the Futurecraft drawings or the valves depicted therein prior to March 29, 1954, except persons working on the Corporal missile program or the Cook research sled program or the Bomarc missile program and having a Government security classification of "Confidential" or higher.

The Corporal missile, the Cook research sled and the Bomarc missile were classified "Confidential" or higher until a date not earlier than March 29, 1954.

Plaintiffs' patent application, when filed, was duly classified "Confidential" by the Pasadena Office of the Los Angeles Ordnance District. Plaintiffs' patent application and the invention described in it and all material information with respect thereto were classified "secret" by the Department of Commerce on October 13, 1954, upon advice of the Armed Service Patent Advisory Board. Declassification of the plaintiffs' patent application and the invention described in it was considered by the Armed Services Patent Advisory Board on June 12, 1958, and the considered judgment of the Board was that the military security classification of "secret" could not then be rescinded or modified. On July 11, 1958, the defendant filed in this action a Claim of Privilege by the Secretary of the Army, Wilber M. Brucker, stating that the Secretary had

"personally considered the technical matters presented by the plaintiffs' claim"

and had

"determined that the plaintiffs' patent application and documents, statements, and testimony which relate, or may relate, to the technical subject matter thereof * * * are military and Army secrets classified as such."

Plaintiffs' patent application and the invention described in it were declassified for the first time on or about April 22, 1959.

The official character of the Manual of Patent Examining Procedure has also been stipulated to. The text of Section 707.05(f), material here, is printed in the margin.[10]

10. "707.05(f) Effective Dates of Declassified Printed Matter

"A large amount of printed matter prepared for use during the war and classified as secret, confidential, or restricted, has been declassified and is now available to the public at large. In using this material as references there are usually two pertinent dates to be considered, namely, the printing date and the publication date. The printing date in some instances will appear on the material and may be considered as that date when the material was prepared for limited distribution. The publication date is the date of release when the material was made available to the public. If the date of release does not appear on the material, this date may be determined by reference to the Office of Technical Services, Commerce Department.

"In the use of any of the above noted material as an anticipatory publication, the date of release following declassification is the effective date of publication within the meaning of the statute.

"For the purpose of anticipation predicated upon prior knowledge under 35 U.S.C. [§] 102(a) the above noted declassified material may be taken as

## II

### Sales

The material portion of the Section under which the defense is based reads:

"A person shall be entitled to a patent unless— * * *

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." [11]

The application for the patent was filed on March 29, 1954. The stipulation admits sales for profit of three different valve structures to separate buyers for governmental use prior to March 29, 1954. All the allowed claims, which by reason of secrecy will not be disclosed, read on one or more of the valves sold. So one of the questions before the court is whether there was a "sale" within the meaning of the Section.

Provisions similar to the one now discussed invalidating patents, if the patented device had been on sale beyond a certain period, have been in prior patent statutes. And the courts have held repeatedly that a single sale is sufficient to invalidate the patent when granted.[12] The rule and the exceptions to it were well stated in one of the cases just cited:

"A single sale to another of such a machine as that shown to have been in use by the complainant more than two years prior to the date of his application would certainly have defeated his right to a patent; and yet, during that period in which its use by another would have defeated its right, he himself used it, for the same purpose for which it would have been used by a purchaser.

---

prima facie evidence of such prior knowledge as of its printing date even though such material was classified at that time. When so used the material does not constitute an absolute statutory bar and its printing date may be antedated by an affidavit under Rule 131 [35 U.S.C.A., Appendix]. (Notice of Feb. 24, 1947, Revised.)"

(Manual of Patent Examining Procedure, Second Edition, November 1953, Rev. 3, June 1957).

11. 35 U.S.C.A. § 102(b). Provisions against "sale" or "use" beyond a certain period have a long history. There were similar ones in the first Patent Act of 1790 (Ch. 34) which were carried over into the Act of 1793 (Ch. 11). They have been retained despite frequent amendments to those statutes. See, Patent Act of 1836, §§ 6, 7 and 15, 5 Stat. at Large 117; Patent Act of 1839, § 7, 5 Stat. at Large 353; Patent Act of 1865, § 61, 13 Stat. at Large 533; Revised Statutes, 1874, § 4920; Patent Act of 1952, 35 U.S.C.A. § 102.

12. Consolidated Fruit-Jar Co. v. Wright, 1876, 94 U.S. 92, 94, 24 L.Ed. 68; Smith & Griggs Mfg. Co. v. Sprague, Adm'x, 1887, 123 U.S. 249, 256, 8 S.Ct. 122, 31 L.Ed. 141; Covert v. Covert, C.C. W.D.N.Y.1901, 106 F. 183, 187–188; Burke Electric Co. v. Independent Pneu-matic Tool Co., 2 Cir., 1916, 234 F. 93; Lorenz v. Colgate-Palmolive-Peet Co., 3 Cir., 1948, 167 F.2d 423, 429–430; Baumler v. Ford Motor Co., D.C.Minn.1949, 89 F.Supp. 218, 220–221. Pitts v. Hall, C.C.N.Y.1851, 2 Blatchf. 229, Fed.Cas. No. 11,192, 19 Fed.Cas. 754, contains a statement by Circuit Justice Nelson giving the reason for the rule which has been quoted very often by courts (including the Supreme Court in Consolidated Fruit-Jar Co. v. Wright, supra, 94 U.S. at page 94):

"* * * the patentee may forfeit his right to the invention if he constructs it and vends it to others to use, or if he uses it publicly himself in the ordinary way of a public use of a machine, at any time prior to the period of two years before he makes his application for a patent. That is, he is not allowed to derive any benefit from the sale or the use of his machine, without forfeiting his right, except within two years prior to the time he makes his application." Pitts v. Hall, supra, 19 Fed.Cas. at page 757.

Under these authorities an offer to sell is a sale. And see, Magee v. Coca-Cola Co., supra Note 8, 232 F.2d at page 600; Maibohm v. RCA Victor Co., 4 Cir., 1937, 89 F.2d 317, 320–321; Chicopee Manufacturing Corp. v. Columbus Fiber Mills Co., Inc., D.C.M.D.Ga.1958, 165 F.Supp. 307, 324–325.

Why should the similar use by himself not be counted as strongly against his rights as the use by another to whom he had sold it, unless his use was substantially with the motive and for the purpose, by further experiment, of completing the successful operation of his invention?

"On the other hand, the use of an invention by the inventor himself, or by another person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded in this court as such a public use as under the statute defeats his right to a patent." [13]

The manufacture of a single machine upon an oral order by the inventor followed by delivery is sufficient.[14]

■■ If we apply these principles to the stipulated facts the legal conclusion is warranted that there was a sale. The sale, it is true, was to a prime contractor for the Government. But as no conditions of secrecy were imposed by the inventor, the fact that the only use of the device that could be made was on Government weapons or that, under the law, the contractor was bound by secrecy, a violation of which was punishable as a crime,[15] does not stand in the way of considering the sales to have been *unrestricted by a condition imposed by the inventor*.[16]

■ Restricted or secret sales do not result in "public use". This protects the inventor against having a sale for experimental purposes turned by others, without his consent, into a public use. However, as stated in an old case:

"*Any attempt to use it for a profit, and not by way of experiment, for a longer period than two years before the application, would deprive the inventor of his right to a patent.*" [17] (Emphasis added)

The prime contractors, in the circumstances detailed in the stipulations, acquired *the unlimited right of any buyer who buys a device free of any conditions imposed upon its subsequent use by the inventor*. So, the attempt to draw a distinction between a public and a private sale on non-legal dictionary definitions is devoid of any relevance to the issue. For the courts have interpreted the meaning of the words for us.

■■ Certain products, by their nature, can have a limited use only. The place of a mechanical part which fits into a larger construction may be such that *the public* can never see it. The number of persons who may use it may also be limited. Nonetheless, the buyer acquires "unlimited" rights unless the contract of purchase limits the use which the buyer may make of the article. The nature of a sale of this character cannot be *changed* by the seller after the purchase. As said in one of the cases already cited:

"We observe, in the first place, that *to constitute the public use of*

13. Smith & Griggs Mfg. Co. v. Sprague, Adm'x, supra Note 12, 123 U.S. at page 257, 8 S.Ct. at page 126. Other cases declaring the same rule are Egbert v. Lippmann, 1881, 104 U.S. 333, 336, 26 L.Ed. 755; National Cash Register Co. v. American Cash Register Co., 2 Cir., 1910, 178 F. 79, 82; A. Schrader's Sons, Inc. v. Wein Sales Corporation, 2 Cir., 1925, 9 F.2d 306, 308; Metallizing Engineering Co., Inc. v. Kenyon Bearing & Auto Parts Co., Inc., 2 Cir., 1946, 153 F. 2d 516, 520; Schmeiser v. Thomasian, 9 Cir., 1955, 227 F.2d 875, 876.

14. National Cash Register Co. v. American Cash Register Co., supra Note 13, 178 F. at pages 83–84. See, Maibohm

v. RCA Victor Co., supra Note 12, 89 F.2d at pages 320–321.

15. 18 U.S.C.A. § 793.

16. Hall v. Macneale, 1882, 107 U.S. 90, 97, 2 S.Ct. 73, 27 L.Ed. 367; Standard Automatic Mach. Co. v. Karl Kiefer Mach. Co., D.C.S.D.N.Y.1925, 18 F.2d 326, 330; Watson v. Allen, 1958, 103 U.S. App.D.C. 5, · 254 F.2d 342, 345. See additional cases in Note 24.

17. Root v. Third Avenue Railroad Co., 1892, 146 U.S. 210, 225, 13 S.Ct. 100, 104, 36 L.Ed. 946. See, Elizabeth v. Pavement Co., 1877, 97 U.S. 126, 134–135, 24 L.Ed. 1000.

*an invention it is not necessary that more than one of the patented articles should be publicly used.* The use of a great number may tend to strengthen the proof, but one well-defined case of such use is just as effectual to annul the patent as many. McClurg v. Kingsland, 1 How. 202 [11 L.Ed. 102]; Consolidated Fruit-Jar Co. v. Wright, 94 U.S. 92, 24 L.Ed. 68; Pitts v. Hall, 2 Blatchf. 229 [Fed.Cas.No.11,192, 19 Fed.Cas. 754]. For instance, if the inventor of a mower, a printing-press, or a railway-car makes and sells only one of the articles invented by him, and allows the vendee to use it for two years, without restriction or limitation, the use is just as public as if he had sold and allowed the use of a great number.

"We remark, secondly, that, whether the use of an invention is public or private does not necessarily depend upon the number of persons to whom its use is known. If an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, *such use is public, even though the use and knowledge of the use may be confined to one person.*

"We say, thirdly, that *some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye.* An invention may consist of a lever or spring, hidden in the running gear of a watch, or of a rachet, shaft, or cog-wheel covered from view in the recesses of a machine for spinning or weaving. *Nevertheless, if its inventor sells a machine of which his invention forms a part, and allows it to be used without restriction of any kind,*

*the use is a public one."*[18] (Emphasis added)

So even if the contention of the plaintiffs in this respect, that the phrase "public" in the section [19] applies to "sale", be correct, the sale here was a public one. But, as is evident, the contention is unsound. It would require us to change the phrase "on sale" to "on public sale".

■■ The use of the word "or" in a statute indicates an intention to use it *disjunctively* so as to designate alternative or separate categories.[20] The section and its long history indicate that in laying down the conditions for patentability the Congress determined, *among other conditions,* that no patent should be granted if:

1. The invention was known or used by others in this country before it was invented by the applicant; or

2. It was patented or described in a printed publication in this or a foreign country before the invention; or

3. It was patented or described in a printed publication in this or a foreign country more than a year prior to the date of application; or

4. It was in "public use" in this country more than one year prior to the date of the application; or

5. It was "on sale" in this country more than one year prior to the date of the application; or

6. It was invented by another.

Under the rule of statutory construction referred to, each alternative category must be considered separately and the conditions laid down in it by the Congress followed. And logically, such construction is also justified, for the categories established by the Congress involve separate and distinct situations which do not necessarily overlap. To illustrate:

There may be "description" or "publication" without a "sale" or "public use".

18. Egbert v. Lippmann, supra Note 13, 104 U.S. at page 336.

19. 35 U.S.C.A. § 102(b).

20. 82 C.J.S. Statutes § 335; De Sylva v. Ballentine, 1956, 351 U.S. 570, 573–574, 76 S.Ct. 974, 100 L.Ed. 1415.

A "public use" may arise without a "description", "publication", or a "sale". In like manner, a "sale" may occur without "publication", "description" or a "public use". So we cannot comingle these categories and apply to some, conditions which relate to others without arriving at a strained or unnatural interpretation of this Section, contrary to the historical judicial interpretation given to it. The adjective "public" modifying the word "use" cannot, therefore, be carried over to the subsequent word "sale" without doing violence to the clear intent of the Congress to treat each category separately.

## III

### Public Use

■ From what precedes, the inference is warranted that here, factually and legally, there was a "public use".[21] The distinction between private and public use is old in the law of patents. Whether one or the other occurred depends upon the particular facts in each case [22] and

"whether the use of an invention is public or private *does not* necessarily depend upon the number of persons to whom its use is known." [23] (Emphasis added)

This principle and other conditions which determine whether there was "public use" were restated recently by the Court of Appeals for the District of Columbia:

"The statutory term 'public use' has been given an extraordinarily broad meaning. In Egbert v. Lippmann [104 U.S. 333, 26 L.Ed. 755], the Supreme Court found public use where the inventor had given a novel corset stay to a lady friend. Thus, *the fact that there is but one user, or the invention is given without profit, or that it is hidden from the general public's eye, would seem to be immaterial.* Nor need the user even realize he is using the invention. It is immaterial that the use was without the inventor's consent, or that the use was due to factors not his fault and beyond his control. *It may be fair to conclude that public use exists where the invention is used by, or exposed to anyone other than the inventor or persons under an obligation of secrecy to the inventor.*" [24] (Emphasis added)

Behind this policy is the thought that while the Congress, under the constitutional mandate, has the power to grant limited protection to inventors for their discoveries,[25] the public interest requires that inventors be not permitted to keep from the public inventions when the experimental stage is passed and they have been perfected. Of course, no time limit is placed upon the period of experimentation. But if a public use is established *by convincing proof* beyond the period of limitation imposed by the section under consideration,[26] public welfare requires that protection be denied to the inventor. As stated by Mr. Justice Story in an early case:

"*If an invention is used by the public, with the consent of the inventor, at the time of his application for a patent, how can the court say, that his case is, nevertheless, such as the act was intended to protect? If such a public use is not a use within the meaning of the stat-*

21. 35 U.S.C.A. § 102(b).

22. Paraffine Companies, Inc. v. McEverlast, Inc., 9 Cir., 1936, 84 F.2d 335, 339; W-R Co. v. Sova, 6 Cir., 1939, 106 F. 2d 478, 481–482; Gillman v. Stern, 2 Cir., 1940, 114 F.2d 28, 29–30; C. S. Johnson Co. v. Stromberg, 9 Cir., 1957, 242 F.2d 793, 794–795 and cases cited in Note 3 of that opinion.

23. Egbert v. Lippmann, supra Note 13, 104 U.S. at page 336.

24. Watson v. Allen, supra Note 16, 254 F. 2d at page 345. The principle that secrecy *must be imposed by the inventor* is given general acceptance: National Tube Co. v. Steel & Tubes, Inc., 3 Cir., 1937, 90 F.2d 52, 53; Jordan v. Hemphill Co., 4 Cir., 1950, 180 F.2d 457, 462. See cases cited in Note 16.

25. United States Constitution, Art. I, § 8, cl. 8.

26. 35 U.S.C.A. § 102(b).

*ute, what other use is? If it be a use within the meaning of the statute, how can the court extract the case from its operation, and support a patent, where the suggestions of the patentee are not true, and the conditions, on which alone the grant was authorized to be made, do not exist?* In such a case, if the court could perceive no reason for the restrictions, the will .of the legislature must still be obeyed; it cannot and ought not to be disregarded, where it plainly applies to the case. But if the restriction may be perceived to have a foundation in sound policy, and be an effectual means of accomplishing the legislative objects, by bringing inventions early into public and unrestricted use; and, above all, if such policy has been avowed and acted upon in like cases in laws having similar objects; there is very urgent reason to suppose, that the act in those terms embodies the real legislative intent, and ought to receive that construction." [27] (Emphasis added)

In applying this principle, the Court of Appeals for the Second Circuit said:

"It is true that for the limited period of two years he was allowed to do so, possibly in order to give him time to prepare an application; and even that has been recently cut down by half. *But if he goes beyond that period of probation, he forfeits his right regardless of how little the public may have learned about the invention; just as he can forfeit it by too long concealment, even with-*

out exploiting the invention at all." [28] (Emphasis added)

The object of the Patent Law is, in the language of the constitutional provision:

"to promote the Progress of Science and useful Arts, by securing for limited Times to * * * inventors the exclusive Right to their * * * Discoveries." [29]

The Congress has, in giving effect to the dual object of the constitutional mandate, limited the term of the patentee's monopoly. At the same time, it has allowed him a period prior to the filing of the actual application in which to experiment and complete the invention. This is a valid deferment of the beginning of the term of a patent. In so protecting the patentee inventions are encouraged and the public gains through their use. For this reason, as stated by Mr. Chief Justice Taft:

"The importance in working out the purpose of Congress of keeping the inventor's monopoly within the term for which the patent is granted is thus shown to be capital." [30]

However, as stated in the same case:

*"Any practice by the inventor and applicant for a patent through which he deliberately and without excuse postpones beyond the date of the actual invention,* the beginning of the term of his monopoly, and thus puts off the free public enjoyment of the useful invention, *is an evasion of the statute and defeats its benevolent aim."* [31] (Emphasis added)

---

27. Pennock v. Dialogue, 1829, 2 Pet. 1, 20, 7 L.Ed. 327. See, Elizabeth v. Pavement Co., supra Note 17, 97 U.S. at page 135.

28. Metallizing Engineering Co., Inc. v. Kenyon Bearing & Auto Parts Co., Inc., supra Note 13, 153 F.2d at page 520.

29. United States Constitution, Art. I, § 8, cl. 8.

30. Woodbridge v. United States, 1923, 263 U.S. 50, 56, 44 S.Ct. 45, 47, 68 L.Ed. 159.

31. Woodbridge v. United States, supra Note 30, 263 U.S. at page 56, 44 S.Ct. at page 47. This has been the undeviating attitude of the Supreme Court. In Elizabeth v. Pavement Co., supra Note 17, the Court said:

"Whilst the supposed machine is in such experimental use, the public may be incidentally deriving a benefit from it. If it be a grist-mill, or a carding-machine, customers from the surrounding country may enjoy the use of it by having their grain made into flour, or their

## Summary and Conclusion

In the light of what precedes, it is quite apparent, both on legal authority and under the undisputed facts, that the sales of the invention by the plaintiffs more than one year prior to the filing of the application for the patent, without a pledge of secrecy and without restrictions or reservation to the plaintiff of any control over the subsequent use of the device, resulted in a "public use" which invalidated the patent.[32] Subsequent conditions imposed on the use, *by others*, either under contract with the Government or by law, did not change the character of the unconditional sale and consequent public use.

 As the stipulated facts show, the sales were voluntary on the part of the plaintiffs and for profit. The prime contractors to whom the plaintiffs sold the devices, for use on Government rockets and missiles, were free to use them as they saw fit. If the public use by the contractors invalidated the patent granted subsequently, the fault was Piet's. He knew the scope of the invention and its proposed use. As he intended to patent the invention, it was his duty, *when he made the sales*, to protect it from premature disclosure through public use by proper contractual provisions, insuring secrecy. He did not do so.

To allow recovery, in these circumstances, we would have to impress the sales with a "secrecy" limitation, which the seller *did not* give to them. This would be inequitable, as it would deprive the Government of the defense of invalidity allowed by statute.[33] It would also go counter to a fundamental maxim of American Jurisprudence, *volenti non fit injuria*, which means that there can be no injury, i. e., legal wrong, through consent.[34] Here *there was more than consent*. The sales were initiated by the plaintiffs because *they wished to make them*. So the application of the maxim is most appropriate. For the word "volenti" stems from the verb "volo", the meaning of which is "to be willing, to wish". And by sustaining the defense of prior sale and public use we merely give legal effect to what the plaintiffs *willed* when they made the sale.

We conclude, therefore, that, by reason of prior "sales" and "public use", the patent in suit is invalid and that the defendant is entitled to judgment, that the plaintiffs take nothing against it by the Complaint. Formal findings and judgment to be prepared by counsel for the Government under Local Rule 7, West's Ann.Code, *unless the parties agree that the stipulated facts may stand as findings, in which even only conclusions of law and judgment need be prepared*. Costs to the defendant.

---

wool into rolls, and still it will not be in public use, within the meaning of the law.

"*But if the inventor allows his machine to be used by other persons generally, either with or without compensation, or if it is, with his consent, put on sale for such use, then it will be in public use and on public sale, within the meaning of the law.*" (97 U.S. at page 135) (Emphasis added)

:32. See, Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 17, 59 S.Ct. 675, 83 L.Ed. 1071; Whiteman v. Mathews, 9 Cir., 1954, 216 F.2d 712, 716. And see the writer's opinion in Ever-

lube Corporation of America v. Electrofilm, Inc., D.C.1957, 154 F.Supp. 788, 799–804. The Court of Appeals for the Ninth Circuit affirmed the judgment in the above case and adopted as its own the portion of the writer's opinion relating to prior "public use": Electrofilm, Inc. v. Everlube Corporation of America, 1959, 265 F.2d 495.

33. 35 U.S.C.A. § 183; 28 U.S.C.A. § 1498.

34. 92 C.J.S. Volenti pp. 1027–1028; Ballentine's Law Dictionary, 1923, p. 519; Yankwich, California Pleading and Procedure, 1926, § 164. See, Surface v. Safeway Stores, Inc., 8 Cir., 1948, 169 F.2d 937, 942.