The **DUNLOP COMPANY, LIMITED,**
Plaintiff,

v.

**KELSEY–HAYES COMPANY, Defendant.**
Civ. A. No. 30629.

United States District Court,
E. D. Michigan, S. D.
May 15, 1972.

Jerome F. Fallon, Dawson, Tilton, Fallon & Lungmus, Chicago, Ill., John R. Hocking, Helm, Marshall & Schumann, Detroit, Mich., for plaintiff.

Don K. Harness and Hugh G. Harness, Harness, Dickey & Pierce, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

PHILIP PRATT, District Judge.

This is a patent infringement suit brought by the plaintiff, The Dunlop Company, Limited, a British company located in London, England, against the defendant, Kelsey-Hayes Company, a Delaware corporation, located in Romulus, Michigan.

The plaintiff is the owner of the four patents in suit—Nos. 2,790,516, Reissue 24,870, 2,921,650 and 3,392,809—(hereinafter referred to by the last three digits of each patent number) all of which relate to vehicle disc brakes. Plaintiff contends that disc brakes manufactured and sold by defendant infringe various claims of these respective patents and seeks injunctive relief and an accounting for damages.

The defendant is a manufacturer of automotive parts, including brakes, and the disc brakes in issue here are those supplied to the Ford Motor Company. Defendant denies infringement, asserts the invalidity of each of the patents and also claims the patents are unenforceable because of plaintiff's misuse thereof and because of other improper and inequitable conduct.

The parties have stipulated that the Court has jurisdiction of the parties and the subject matter and the Court so concludes.

Sometime prior to World War II, the usual, if not universal vehicle stopping device was a "drum brake," whose principle was the application of friction members, commonly called "brake shoes" against the inner periphery of a drum which was a part of the wheel assembly. The exigencies of stopping large aircraft inspired the development of disc brakes for that purpose, and several manufacturers, including the plaintiff and Goodyear Tire and Rubber Company, were major suppliers of aircraft disc brakes.

The drum brake has a critical fault. The application of the brake shoes to the periphery of the rotating drum creates heat which can be dissipated only through the drum itself and then into the atmosphere. The high temperatures resulted in the loosening of the brake shoes and caused a loss of braking power, customarily called "brake fade."

The disc brakes alleviates, by its design and structuring, this problem of heat retention and permits the heat to dissipate directly into the atmosphere. In principle, the disc brake is composed of a disc and a brake housing or caliper. The disc is attached to the wheel and rotates with it. The housing is fixed to the car assembly and straddles a portion only of the disc. The application of the brake pedal causes hydraulic fluid to pressure pistons against friction members located in each limb or side of the

housing, forcing these friction members to "pinch" the revolving disc. Simplisticly, one can demonstrate the principle by rolling a coin along a desk top and pinching the coin between thumb and forefinger as it is rolling. The resulting exposure of most of the disc and the relatively small friction members permits quick and comparatively unhampered heat dissipation into the atmosphere and presents the major advantage of the disc brakes over the drum brake.

The end of World War II and the cut-back in aircraft production with the concomitant increase in automotive production saw more attention being focused on the development of a disc brake suitable for vehicles other than aircraft. Although the principle of disc brakes was established, the application made to aircraft was not readily adaptable to automotive vehicles, obviously a huge market.

As is indicated by the file and records of this suit, various organizations and individuals became engaged in the development of automotive disc brakes, including the plaintiff Dunlop. It obtained patents, including the patents in suit, and inceptively used as a major testing and promotional arena the sports car racing circuit on the Continent, first with the Jaguar automobiles and later with an increasing number of other European automobiles. Plaintiff granted licenses under its patents to firms in several countries and in 1956 licensed Bendix Corporation under the first three patents in suit as its exclusive licensee in the United States. Despite the growing acceptance of disc brakes on the Continent and elsewhere, the American automotive industry, while evidencing interest and conducting its own research in disc brakes, was not enthusiastic. The extent of Bendix commercialization of its license was limited to one Studebaker model.

In January, 1961, the General Manager of plaintiff's Brake Division gave a talk on disc brakes to a convention of engineers in Detroit. This honed the interest of the defendant, a manufacturer of drum brakes, and contact was made with plaintiff. This contact continued during late 1961 and through 1962 and 1963 and included visits by defendant's engineers to plaintiff's plants in England and the release of technical information and advice by plaintiff to defendant regarding particularly the adaptation of disc brakes to the larger and differently designed American automobiles.

These discussions and conferences culminated in Bendix, the exclusive Dunlop licensee in the United States, granting to the defendant a sublicense under the three fixed caliper patents in suit in July, 1963. Shortly after the sublicense agreement, the defendant learned of certain prior Goodyear activity in the disc brake area and this activity was investigated by both plaintiff and defendant.

The Goodyear activity, more of which will be described below, raised questions regarding the validity of the plaintiff's fixed caliper patents and, when negotiations eventually proved fruitless, resulted in the termination of the sublicense on January 1, 1966.

### The '516 Patent

The '516 patent was issued to plaintiff by the United States Patent Office on April 30, 1957. It is of the fixed caliper (housing and caliper are used interchangeably in the trade) type with the caliper straddling a portion of the disc. The caliper is bolted to stationary part of the vehicle assembly while the disc is affixed to the wheel assembly (axle or stub axle) and rotates with it. Roughly, the caliper is in the form of an arch or "U" and can be generally described as two limbs and a bridge piece. The two limbs are adjacent to and alongside of the disc, while the bridge piece is outside of the rim of the disc, much like the coin and finger demonstration above. Each limb contains at least one bore or cylinder into which fit pistons and friction pads. Hydraulic fluid pressure forces the pistons against the pads, which are, in turn, forced against the

rotating disc and pinch the disc to a stop. Since the disc is attached to the wheel assembly, this, of course, causes the wheel to stop rotating also.

### Validity of '516 Patent

The defendant has challenged the validity of the '516 patent, the basis of the challenge being the prior Goodyear Tire Company activity. Defendant points to four alleged sales of Goodyear disc brakes as constituting prior art in anticipation of the plaintiff's '516 brake. The plaintiff contends that the four alleged sales are not, in fact and in law, the types of sales which fulfill the prior art criterion so as to invalidate the '516 patent.

With respect, then, to this issue, the Court makes the following specific findings of fact.

1. The Goodyear PD 1018–1 disc brakes (the radar trailer brakes) are substantially identical to the brake claimed in the '516 patent. The fact that a shield was installed over the unit for purposes of meeting the Army Ordinance water-tight specifications does not affect the design of the unit itself. The fact that the friction members may not have been separate from the pistons is a minimal consideration and an obvious construction.

2. The Goodyear PD 1018–1 disc brakes were manufactured and sold by Goodyear Tire Company in 1949 for use on radar trailers built by Brooks and Perkins Company of Detroit, Michigan and Douglas Aircraft Company of California.

3. The two radar trailers were built pursuant to government contract for the purpose of housing radar equipment to provide mobility for radar units and were designed to be pulled by a truck.

4. Disc brakes were installed on both trailers and the trailers subsequently were sold and delivered to the Army Ordinance Department.

5. The disc brakes were tested to some extent and were not found to be unsatisfactory, but were replaced by electric brakes on the requirement of Army Ordinance. There is no indication that the replacement was occasioned by the performance of the disc brakes but rather for other reasons.

6. The mobile radar trailer project was classified "Restricted" by Ordinance authorities. Despite that classification no meaningful attempts were made to comply with it with regard to the disc brakes and other parts of the trailer fabrication. Rather, it was considered that the confidential aspect of the project was the radar equipment to be placed in the trailer. This is evidenced by the lack of any precautionary measures, for example, in the manufacturing of the brakes, the fabrication of the trailer, the installation of the brakes, the public testing of the trailer after brake installation as to its water-tightness and the transport of the completed trailer (prior to installation of radar equipment) from Detroit to New Jersey on an open, flat-bed railroad car.

7. While the Goodyear 1018–1 brake manufacture was a special project at Goodyear, there being no constant market for disc brakes, the indicia that would establish that it was an experimental model, or create inferences to that effect, are lacking. The appearance is much more closely akin to a "custom job" than to prototype development.

8. The Goodyear PD 1009–F (Hawley) disc brake is substantially identical to the brake claimed in the '516 patent. Again the fact that the friction pads may have been connected to the pistons does not materially affect the anticipation.

9. The Hawley brake was designed by one Jesse G. Hawley, and on October 24, 1944, a 1941 Ford coupe equipped with the Hawley disc brake was sold to Goodyear. Hawley had a working relationship with Goodyear and the agreement, which included the sale of the Ford coupe, contains provisions regarding development of disc brakes in other than the airplane field, royalty and licensing, patent prosecution and the like.

10. The Hawley disc brakes as installed on the Ford coupe were demonstrated to various automobile manufacturers and the coupe was used by Goodyear engineers and personnel and eventually sold to a company in Akron.

11. The Hawley disc brakes operated successfully and satisfactorily except that testing showed that driving over excessively rough roads at relatively high speeds caused a "spindle deflection." This deflection related to the disc and its mounting but the effect was to push the disc against the friction members of the caliper and, in turn, the pistons, forcing the pistons back into the cylinder and retarding the braking process.

12. Goodyear continued the development of disc brakes, including but not limited to the development of "floating" calipers to avoid the problems incident to "spindle deflection" and one of its manufactured designs in this program was the radar trailer brakes above described, which were, however, of the fixed caliper type.

13. The Goodyear PD 457 (helicopter rotor) brakes are substantially identical to the brake claimed in the '516 patent.

14. The evidence regarding the development and sale of the helicopter rotor brakes is not overwhelmingly clear. Consideration must be given, however, to the lapse of time between this project and the time of this lawsuit—almost 20 years later. On this basis, the Court is satisfied that the pertinent exhibits and testimony establishes the following related findings.

15. The Goodyear PD 457 brake was a disc brake designed to stop the rotation of the helicopter blade rotor and several were manufactured for and sold to Sikorsky Aircraft in 1949–1950 and with modification, thereafter.

16. The Goodyear PD 457 was, again, "experimental" only in that it was an adaptation of the disc brakes being developed by Goodyear to the helicopter rotor and was a customizing for a particular customer who purchased at least six of such brakes.

17. The testing indicated metal fatigue problems but did not militate against satisfactory performance and the sale to Sikorsky, who did not require testing.

18. The Goodyear PD 1055–2 (wind tunnel) brake is substantially identical to the claims of the '516 brake and was a disc brake manufactured for and sold to United Aircraft Corp. in 1950 for the purpose of braking a wind tunnel fan.

19. The wind tunnel fan brake was installed in the Spring of 1950 and operated successfully until January 3, 1952.

20. The failure occurring in January, 1952, was related to the design and milling of the *disc* rather than of the brake itself.

21. Later changes in the number of brakes, in the design of the caliper and in the design of the disc do not permit the conclusion that the PD 1055–2 disc brake was inoperative, unsuccessful, or abandoned.

22. Particular significance is given to the cumulative effect of the four examples of the Goodyear activity—all dealing with the same basic design and structure of a disc brake strikingly similar to the '516 disc brake.

23. None of the foregoing evidence of Goodyear disc brake activity was considered by the Patent Office prior to issuance of the '516 patent.

24. After receiving the opinion from its attorneys about the doubtful validity of the '516 patent and after defendant had indicated to Bendix that it thought the '516 patent was invalid because of the Goodyear prior art disc brake situation, plaintiff's General Manager of its Brake Division wrote defendant's attorney on May 13, 1964 and stated:

"The reports from our attorneys are in fact very much as we expected them to be. Considerable doubt is expressed as to the validity of No. 2,790,516 in view of the Goodyear disclosures. However, it also seems the case that most of the evidence on

which an opponent might have to rely has been destroyed or is no longer available and whilst we think that we would be reluctant to litigate this patent we would not like you to assume that in no circumstances would we fail to do so. On the contrary it could well be of advantage to us, commercially, to start an action for infringement."

### Conclusion of Law Regarding Validity of '516 Patent

■ The Goodyear activity, which predates the filing date of the '516 patent, constitutes prior art and invalidates the claim in suit of the '516 patent under 35 U.S.C. 102(a), (b) or (g).

### Discussion Regarding Invalidity of '516 Patent

■ The '516 patent does not enjoy the full presumption of validity when, as here, significant prior art was not considered. As stated in B. F. Goodrich Co. v. Rubber Latex Products, Inc., 400 F.2d 401, 405 (6th Cir., 1968):

"Although 35 U.S.C. § 282 creates a presumption that a patent is valid, it has long been held in this and other circuits that this presumption is weakened and largely dissipated when pertinent prior art, . . . was not considered by the Patent Office during processing of the patent in suit." (Citations Omitted).

See also Westwood Chemical, Inc. v. Owens-Corning Fiberglass Corp., 445 F.2d 911, 916 (6th Cir., 1971), cert. den. 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972).

It cannot be seriously argued that the Goodyear devices which constitute the prior art were not "known or used by others in this country." 35 U.S.C. § 102(a). The evidence indicates that the devices were used on a variety of jobs for a variety of purposes several years before plaintiff's first claiming date. In the case of the '516 patent, that date is January 22, 1951. Kaiser Industries Corporation v. McLouth Steel Corp., 400

F.2d 36, 42 (6th Cir., 1968), cert. den. 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124, 35 U.S.C. §§ 104 and 119.

■ It is immaterial that the Goodyear brakes were not all automobile brakes. They were used in an analogous art for an analogous purpose. Gates Iron Works v. Fraser, 153 U.S. 332, 14 S.Ct. 883, 38 L.Ed. 734 (1894).

■ Nor is the fact that a device may be hidden from sight, as in the auto, sufficient to avoid anticipation. Brush v. Condit, 132 U.S. 39, 49, 10 S.Ct. 1, 33 L.Ed. 251 (1889).

■ Extended use is not a requirement. One or two successful applications to use are sufficient. Miller v. Foree, 9 F. 603 (6th Cir., 1881), affirmed 116 U.S. 22, 6 S.Ct. 204, 29 L.Ed. 552.

■■ Plaintiff's argument that the Goodyear devices were inoperative and therefore disqualified as prior art is not persuasive. A similar argument was rejected by the Court in Sutter Products Co. v. Pettibone Mulliken Corp., 428 F.2d 639, 646–647 (7th Cir., 1970):

"Inefficiency, even to the point of practical ineffectiveness, does not necessarily invalidate an invention as prior art in all its aspects. Dalin v. Watson, supra [92 U.S.App.D.C. 270], 204 F.2d [730] at p. 732. So long as it embodies the same construction and principle as the alleged invention, a structure is effective as prior art even though the construction of the machine is crude, or the machine is imperfect in operation. Zephyr American Corporation v. Bates Mfg. Co., 128 F.2d 380, 385 (3rd Cir., 1942)."

Though they were not perfect, the Goodyear devices achieved the desired results. Successful testing is not a necessity. Hall v. Macneale, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367 (1883).

Plaintiff contends that Piet v. United States, 176 F.Supp. 576 (S.D.Cal., 1959), modified on other grounds 283 F.2d 693 (9th Cir.), stands only for the proposition that an inventor may not lengthen his monopoly by sale of his invention

into a restricted use, and that Technitrol, Inc. v. Aladdin, Inc., 316 F.Supp. 630 (N.D.Ill.1970) stands for the proposition that sale by one other than the inventor into a restricted use disqualifies the invention as prior art. Even assuming that these contentions are legally correct, they are not supported by the facts in the instant case.

The issue of whether a use of a device is experimental or public is one of fact. McCullough Tool v. Well Surveys, Inc., 343 F.2d 381, 394 (10th Cir., 1965), certiorari denied 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851, rehearing denied 384 U.S. 947, 86 S.Ct. 1452, 16 L.Ed.2d 545. So too, the question of whether a use is secret is one of fact. Huszar v. Cincinnati Chemical Works, 172 F.2d 6 (6th Cir., 1949). In the instant case the Court found as a matter of fact that the use of the radar trailer brake was not a restricted use.

### Infringement of Patent '516

While a general and simplistic description of the '516 patent was given previously, it is necessary to analyze carefully the claim language of the patent in dispute here. Specific findings below follow serially the previous findings.

1. Claim 1 of the '516 patent in suit reads as follows:

"A disc brake assembly comprising a disc engaging with a rotatable member to be braked and braking means extending circumferentially over only a minor portion of the braking surfaces of the disc and comprising a nonrotatable housing having limbs extending closely adjacent each braking surface of the disc and in fixed axial relation thereto, each such said limb having an opening in each limb forming a guide, a friction member slidable in each guide opening, the end of each guide opening having a clearance from the adjacent braking surface of the disc which remains constant throughout the wear-life of the friction member, and means for forcing each friction member into frictional engagement with the adjacent braking surface of the disc."

2. Claims 2, 3, 4, 7 and 11 of the '516 patent are directly or indirectly dependent from claim 1 and contain all of the structure called for in claim 1.

3. Claim 12 of the '516 patent, while not dependent on claim 1, is similar thereto and reads as follows:

"A disc brake assembly comprising a disc engaging with a rotatable member to be braked and braking means extending circumferentially over only a minor portion of the braking surfaces of the disc and comprising a nonrotatable housing having limbs extending adjacent each braking surface of the disc and in fixed axial relation thereto, friction members, one on each side of said disc, each movable to bring its friction surface into frictional engagement with its side of said disc, each limb providing an anchoring element extending toward the disc in position to receive adjacent said disc the anchoring thrust of its friction member, said anchoring element having a clearance from the adjacent braking surface of the disc which remains constant throughout the wear-life of the friction member, and means for forcing each friction member into frictional engagement with the adjacent braking surface of the disc."

4. All of the mechanical elements of the patent '516 claims find response in the preferred form of the invention seen in Figures 1–3 of the patent.

5. The crucial area of dispute between the parties is the interpretation of and response to the claim relating to the "limbs extending closely adjacent each braking surface of the disc and in fixed axial relation thereto" and "each limb having an opening in each limb forming a guide, or friction member slidable in each guide opening, *the end of each guide opening* having a clearance from the adjacent braking surface of the disc which remains constant

throughout the wear-life of the friction member." (Emphasis supplied).

6. Claim 12 provides a further dispute in the language, to wit: "each limb providing an anchoring element extending toward the disc in position to receive adjacent said disc the anchoring thrust of its friction member, *said anchoring element* having a clearance . . . which remains constant throughout the wear-life of the friction member . . ." (Emphasis supplied).

7. The embodiment of '516 shows that each limb extends closely adjacent each braking surface of the disc and that each limb contains a bore or cylinder (the singular is used for the sake of clarity but with the recognition that more than one bore or cylinder is contemplated by the claims) which is, in effect, a hollowed out portion of the limb.

8. Each bore or cylinder of the '516 embodiment contains within itself two elements—a piston and a friction pad or member.

9. The friction pad is enclosed in the cylinder, except for a small portion between the end of the cylinder and the surface of the disc and is guided in the cylinder itself.

10. Application of hydraulic fluid pressure forces the cylinder against the pad which pushes against the disc and causes the friction material to wear.

11. However, because the end of the bore or cylinder is closely adjacent to the disc surface and the friction pad is contained in the cylinder, the wearing of the friction pad does not affect its points of support since the more the pad wears the farther the piston travels in the cylinder towards its end and the closer the back of the friction pad gets to the end of the cylinder.

12. The significance of the support is that it prevents the pad from displacement in the tendency to go in the same direction as the disc is travelling, i. e., it is a torque-taking element or anchoring element.

13. The embodiment fulfills the language of the claim regarding a guide opening and an anchoring element which is closely adjacent to the surface of the disc and remains constant as long as the friction pad has life.

14. The significance of the constancy of the end of the guide opening and anchoring element is that it minimizes a rocking or see-saw action by the friction pad and assures even wear of the pad and fuller use of its entire surface instantaneously.

15. The accused brake also contains cylinders or bores which contain pistons activated by hydraulic pressure. However, the friction pads are not contained *within* the cylinder but ride in an opening created by the form of the housing.

16. The friction pads are elongated and semi-arcuate, and have "ears" on each top end which ride on a ledge machined or cast into the bridging portion of the housing, meanwhile obtaining guidance and anchoring support from the lower extensions of the bridging portion. The "ears" are sustained on the ledges by spring clips.

17. The pistons, therefore, when operating, extend beyond the end of the cylinder and this extension increases as the friction material wears. Concomitantly, as the friction material wears, the friction member moves along the ledge and side guides closer to the disc. The effect of this movement is to change the points of support of the friction member as the friction material wears.

18. The point of support in the accused brake varies with the wear-life of the friction material and (considering the tolerances of the trade) is, at the outset, some distance from the disc and not immediately adjacent thereto.

19. As a result of the varying of the points of support, the form of the friction member and the design of the guiding and anchoring elements of the accused brake, the wear on the friction material is not even or constant as compared to the '516 brake.

20. This resulting unevenness in wear prevents instantaneous application of all the friction material to the disc and shortens the wear-life of the material.

21. The reasonable and realistic interpretation of the claims language, "each such limb having an opening in each limb forming a guide for a slidable friction member," as is indicated by the preferred embodiment, is that the "opening" is the cylinder or bore which inseparably contains both piston and friction pad, rather than an "opening" in the sense of all and any space created by virtue of a device having limbs and bridges.

22. Thus, in the accused brake, the anchoring and supporting elements occur outside of the "opening" of the limbs, and, even, to some extent on the bridging portion of the housing.

### Conclusion of Law Regarding Infringement of '516 Patent

The claims in suit of the '516 patent are not infringed by the accused brake.

### Discussion Regarding Non-Infringement of '516 Patent

In a discussion of the '516 patent and its alleged infringement, it is important to note that it is not the concept of disc brakes that is the issue, but rather improvements of disc brake principles that are allegedly meritorious and patentable. Eibel Process Co. v. Minnesota and Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923).

The essence of the '516 patent is in its design that maintains guiding and anchoring elements proximately close to the disc and which provide a constant point of support to the exposed portion of the friction pad. The accused brake, by its construction, provides for the friction element to be guided and anchored at different points which change the area of support in response to the wear of the pad.

The differing areas of support result in a disadvantage which is not present in the '516 patent, that is, the misalignment of the friction element which cause a taper or uneven wear of the pad.

Much of the dispute regarding the comparison between the '516 brake and the accused brake revolved around the words "opening," "limbs" and the question of whether the '516 patent requires the inclusion of the friction member in the same bore or cylinder which contains the piston.

The words "opening" and "limbs" are not words of art and the experts differed as to the interpretation of those words. The Court readily admits that it is in a quandary when it comes to determining at what points in a "U" shaped structure the "limbs" begin and the "bridge piece" ends. The same may be said as to the word "opening," i. e., when do you open into an enclosure, when do you open from an enclosure out to an expanse. It appears to be prudent, then, to look to the function that is to be performed, and reviewing the specifications of the patent, determine the scope of the claimed improvement.

Using such an approach, the teaching of the '516 patent emphasizes the inclusion of friction element and piston in the same bore or cylinder with the resultant advantages of a constant point of support, and an immutable guide.

To put it simply, the '516 patent is limited by its terms to an opening *in* the limbs and does not apply to the opening formed by the limbs or by the indispensable presence of the limbs.

### The '870 Patent

The '870 patent is a reissue patent based on the '516 patent. It is also of the fixed caliper type but included certain improvements. These improvements were a universal pivoting connection between the piston and the friction element which permitted the friction element to adjust itself to variations of the disc and features which facilitated replacement of worn friction members. Another of the advantages of the connection feature was a more effective

way of dissipating the heat caused by the friction process.

### Validity of '870 Patent

The defendant's attack on the validity of the '870 patent is primarily limited to the feature of the "universal pivoting" connection between the piston and the backing plate of the friction member.

The basis for defendant's claim of invalidity as to claim 9 of the '870 patent is that the language of the claim is overly broad and is not clear and definite as required by the statute. In that context, the defendant asserts that Figure 1 of the patent describes an entirely different concept than does Figure 5, which is the preferred form relied upon by plaintiff in this case, and that if in fact the broad and indefinite language of the claim does adequately cover Figure 5, the claim is invalid over the prior art of the '516 patent. The plaintiff contends that while Figure 1 and Figure 5 may differ technically, the claim language covers both drawings substantially and correctly.

With regard to this issue, the Court makes the following specific findings of fact:

1. Claim 9 of patent '870 reads as follows:

"A disc brake comprising an annular rotatable brake disc having an annular braking surface on each side; a non-rotatable housing mounted in fixed axial position relative to said disc, said housing having a pair of limbs one on each side of said disc and extending over a portion of the path of movement of said braking surface and closely spaced therefrom, said housing having at least one pair of coaxial guide means with one means of each pair in each of said limbs, a friction pad for each guide means of said housing held and guided in its guide means in movement toward its respective braking surface of said brake disc; a pair of coaxial cylinders for each pair of said guide means and aligned therewith, one cylinder of each pair being detachably mounted on the outboard side of one of the limbs of said housing; and a piston for each cylinder slidable axially therein toward and from the braking surface of said disc and having a thrust element on its inboard side to abut its respective friction pad substantially centrally thereof and push said pad to frictional engagement with said disc, said thrust element including means connecting it to said friction element for universally pivoting thrust contact with said friction element whereby said pad is free to adjust itself to variations in said disc and to the wear of said pad by tilting on said thrust element as a pivot to permit limited tilting of said friction pad about the end of said thrust element and whereby said cylinder and piston may be detached from said housing free from its friction pad and displaced to permit withdrawal and replacement of said pad."

2. The '870 patent provides for "distance pieces" between the piston and the backing of the friction element. (The "backing" is a metal piece conforming generally to the size and shape of the friction material. The friction material is affixed to the backing plate and separates the material from direct contact with the piston or other pressure member.)

3. The distance pieces contemplate the serving of two functions, i. e., they provide more rapid heat dissipation and they provide a pivoting action which thereby permits the friction pad to follow the contours or deflections of the disc. Thus, as much as possible of the pad is applied to the disc and wear of the pad is more uniform.

4. In Figure 1 of the patent, the pivoting portion of the distance piece is easily recognizable as a modification of the common "universal joint" or "ball and socket" principle.

5. The "ball and socket" type of element in Figure 1 permits the friction pad to pivot and allows it to follow read-

ily the contours of the disc while the brake is in an operating position.

6. In Figure 5, the distance pieces are flat on the ends that abut the friction pad and do not provide a "universal pivoting" action as called for in the claims and specifications and as pictorially described in Figure 1.

7. The preferred form exemplified by Figure 5, on which plaintiff relies, reads on the prior '516 patent at the very least in so far as the "universal pivoting" action is concerned.

### Conclusion of Law Regarding Invalidity of '870 Patent

Claim 9 of the '870 patent is invalid under the provisions of 35 U.S.C. §§ 103, 112.

### Discussion Regarding Invalidity of '870 Patent

The area of dispute as to the validity of Claim 9 of the '870 patent centers on the term "universal pivoting thrust contact" contained in the claim. As the Court understands it, the defendant does not contest the validity of Claim 9 as to other features involved, but asserts that Figure 5 which the plaintiff reads on the accused brake does not demonstrate a "universal pivoting" connection. The findings and this discussion are therefore limited to that issue.

This Court cannot comprehend any "universal pivoting" connection created by the flat surface of the friction braking plate and the relatively flat surface of the distance piece as is shown in Figure 5, nor, if applied to the accused brake, between the flat backing plate and the end of the piston, even though the piston end may be slightly rounded.

Hodkinson, one of the inventors of the '809 patent in suit and the engineering staff of plaintiff, testified that he could only speculate as to the success of any universal pivoting action given the piston design of the '870 patent and that obtaining the guiding advantages along with a universal pivoting action would require changes in the design of the piston.

The credibility of plaintiff's expert on the issue suffered greatly by virtue of his testimony being at odds with the prepared chart purporting to identify and display the various elements of the claim on the particularly significant issue of the universal connection and thrust element. This expert, a patent attorney, had not prepared the chart and was not entirely familiar with what it purported to depict, such as whether it showed the brake in operation. However, the dismaying feature was not his disagreement with the chart but with his failure to advise the Court voluntarily *as* he testified that the chart did not comport with his testimony and his opinions. It should not have been necessary for the Court to interject for that purpose.

As against this, the testimony of defendant's experts, particularly the testimony of Robert Dix, who is a practicing brake engineer, was overriding in its explanation of the actual workings of the brake and the action obtained when the flat surface of the backing plate comes into contact with the surface of the end portion of the piston. That testimony fortifies a common sense response that no "universal pivoting" or "ball and socket" action occurs under such circumstances.

### Infringement of '870 Reissue Patent

The two major disputes as to this issue revolve about the "universal pivoting connection" and the features regarding ready removal of the pistons to permit easy replacement of the friction member.

1. As to the "universal pivoting connection," the accused brake does not include "distance pieces" as contemplated by the '870 patent.

2. The pistons providing the thrust element are of a piece and abut directly the backing plate of the friction member.

3. To compare separate distinct "distance pieces" to the "end of," an undefined "portion of" or "the part forward of the base of" a unitized piston is a fruitless semantic exercise.

4. The relatively flat end portions of the piston do not provide a "pivoting" action as contemplated by the '870 patent nor does the variation caused by possible retraction differences when two or more pistons are provided on each side of a disc.

5. Further, when the brake is in actual operation, the flat surfaces of the pistons against the flat surfaces of the backing plate do not permit such "universal pivoting action."

6. The '870 reissue patent provides for a construction which facilitates replacement of worn friction members by the removal of the cylinders, thus exposing or permitting easy removal of the distance pieces and the friction member, without the necessity of removing the caliper or even disturbing it to any great extent.

7. The accused brake caliper is cast in two parts, i. e., one part is U-shaped and contains two cylinders; the other part is I-shaped and tops the open end of the U. The I-shaped piece is affixed to a stationary part of the vehicle.

8. In order to obtain access to pistons and friction members in the accused brake, it is necessary, at the very least, to remove the U-shaped portion of the caliper, or roughly two-thirds of the caliper itself. Other manipulations are also required.

9. The accused brake does not include the teachings of the '870 patent regarding removal of cylinders, pistons and friction members.

### Conclusion of Law Regarding Infringement of '870 Reissue Patent

The accused brake does not infringe upon the teachings of the '870 reissue patent.

### Discussion Regarding Non-Infringement of '870 Reissue Patent

The defendant asserts as defenses against the claimed infringement the absence in the accused brake of three major features of the '870 patent, i. e., the absence of detachably mounted cylinders, the absence of a thrust element abutting the friction pad centrally and the absence of a means of connecting the thrust element to the friction element for universal pivoting thrust contact.

As is indicated by the Findings of Fact, it is abundantly clear that there are no detachably mounted cylinders in the accused brake. The '870 patent speaks of guide means in the limbs of the caliper, and a pair of coaxial cylinders for each pair of said guide means. The claim item continues, ". . . a pair of coaxial cylinders for each pair of said guide means . . . one cylinder of each pair being detachably mounted on the outboard side of one of the limbs of the housing . . . ."

However liberally one might interpret and however broadly one might apply that language of the claim, there is no commonality with the accused brake composed of a side which has cast into it a cylinder or bore in which only the piston rides and which is not "detachable" in any sense. As a matter of fact, in the accused brake it is not necessary to remove the cylinders or any part of the housing to remove the pads. The latter service is accomplished merely by unscrewing spring clips and lifting the pads out of the opening in the housing. Further, to remove the pistons it is necessary to remove two-thirds of the housing.

With regard to the absence or presence of a thrust element, the '870 patent contemplates the use of what is called a "distance piece," that is, a separate member which is placed in the guide between the piston and the backing plate of the friction member. The argument of applicability to the accused brake by plaintiff seems strange and strained.

Strange when one considers that hydraulic pressure means usually contemplate the use of pistons and strained in the attempt to correlate an alleged advantage by the utilization of a separate distance piece to the function of a piston. The plaintiff asserts that the thrust element or distance piece has two major functions, i. e., it dissipates more effectively heat that would normally affect the whole piston and provides a universal pivoting action. Since the accused brake piston is of a piece, the heat dissipation advantage is minimized, if not completely subverted. The tortuous reasoning continues along the line that the front portion of the piston, apparently anywhere from the base forward, is the equivalent of a distance piece or thrust element and that if the piston were cut in two, the result would be a "distance piece."

Following that path can only lead to the inappropriate conclusion that any disc brake which utilizes the piston infringes on the '870 patent, since by its very nature, every piston is used as a pressure or thrust element. Clearly the use of a piston system in disc brakes was long accepted and commonly adapted, as is seen in most if not all of prior art on disc brakes submitted in this case. Additionally, the gratuitous suggestion that infringement occurs because the piston could be cut in two to create two pieces is rebutted by the testimony of defendant's technical expert that such a structure would be inoperative. Oddly, the remaining portion of the piston, according to plaintiff's definition, would still contain a thrust element in its forward portion.

The universal pivoting connection has been discussed to some extent under the issue of the validity of the '870 patent and much of that discussion is applicable here. Some reference should be made, however, to the demonstrations of the principle of universal pivoting action conducted by plaintiff's patent expert and defendant's technical expert, particularly since it illustrates what is obviously this Court's preferred reliance on defendant's experts throughout this case. Whatever theoretical principle of physics formed the basis of plaintiff's patent expert's demonstration and drawings on this subject, the application to the contested issue and to the actual operation as testified to by defendant's technical expert was not convincing. At the risk of seeming myopic or phobic, the Court cannot envision a "universal pivoting" relationship being created by the flat surface of the backing plate abutting the ends of the piston used by the defendant's accused brake. The conclusion reasonably reached is that when pressured against the disc by the piston, the friction pad is not going to pivot or tilt, but rather is going to compress and wear unevenly depending on the variations in the disc. The theory is sustained by testimony of actual operation and experience.

### The '650 Patent

The '650 patent is a fixed caliper, opposing piston, disc brake for railroad cars and heavy industrial equipment. Its structural design and configurations differ from the disc brakes adapted to automobile use. The significant, and disputed, feature of the '650 patent as it applies to the brakes in issue is the incorporated feature of the removability of the friction pads.

The specific claim at issue here is Claim 13 which was added to the patent application of the '650 patent on October 28, 1959, some five years after the filing of the original application.

The principle of the '650 patent is contained in the construction of the caliper in such a way that a portion of the caliper itself can be removed to allow the friction members to be replaced without the necessity of removing or disturbing any other part or parts of the brake assembly.

### Validity of the '650 Patent

The defendant attacks the validity of Claim 13 of the '650 patent on the following grounds: the claim is not supported by the disclosure of the patent;

there was prior art against the claim; the invention was obvious; and the claim language is vague and indefinite. The plaintiff denies the applicability of any of those grounds to Claim 13 and asserts its validity.

Parenthetically, it becomes obvious with even minimal association with disc brakes that after, if not during, the perfection of the disc brake concept, the removability of the friction pads is of paramount importance. By virtue of their nature and use, friction pads wear more quickly than any other brake component and a premium would inevitably be placed on a design and structure which provided a quick, easy and inexpensive method of removing and replacing worn friction pads.

1. Claim 13 of the '650 patent reads as follows:

"A disc brake comprising a rotatable disc; a pair of friction elements, one on each side of said disc and covering only a portion of the braking surfaces of said disc, each of said elements having end portions transverse to the direction of movement of the disc and providing bearing surfaces on which said elements are slidably supported; a stationary torque-resisting member having at least three components holding said friction elements from movement in a plane parallel to said disc, and at least one of said components being displaceable to permit removal of said friction elements in a plane parallel to said disc and a pair of said components being held in axially spaced positions on each side of and closely spaced from said disc and having surfaces transverse to the direction of rotation of said disc and placed complementarily to the transverse end portions of said friction elements to guide said elements at their opposite ends in movement to and from said disc and to restrain said elements from circumferential movement parallel with said disc; and means to move said friction elements toward said disc, each of said friction elements being between said means and said disc."

2. The design and configuration of the preferred form of the '650 patent describes a fixed caliper brake with the friction pads outside the cylinders.

3. The caliper is shaped, roughly, like a rectangular box with the two sides carrying the pistons and, importantly, the two ends slanting inwardly towards the bottom.

4. The ends act as torque-taking and guiding members. Outward or radial movement is prohibited by the top of the housing.

5. In addition to providing these torque-taking and guiding surfaces, the '650 patent teaches the removal of one end of the box-like structure, thus permitting the friction members to be removed circumferentially in a plane parallel to the disc.

6. The removable end piece is a tooth-like member (more dramatically, a bicuspid) which straddles the disc in two planes and is attached to the top of the caliper by a bolting device. Thus, the bolt is unscrewed, the end piece is removed and the friction pads slide out.

7. The other end of the box-like caliper provides a bolting device which permits attachment to a stationary part of the railroad car or wheel assembly, and also includes a pair of tooth-like members which straddle the disc.

8. Integral to the technical problem of removal and replacement of friction members is the shape and configuration of the caliper, with the additional qualification that it is obviously prudent to avoid a method which requires a removal of the sides of the caliper since, generally, they contain the pistons and power units.

9. As has been noted, the essence of the '650 patent is the division of the caliper into three components which provide guiding and anchoring surfaces to the friction pads with one of said components (the "bridge piece," described earlier as the "tooth-like" member) being

readily displaceable for easy access to the friction pads.

10. With the slanting of the two sets of tooth-like members, the friction pads are prevented from falling inwardly towards the axle of the wheel assembly, and, at the same time, guide the pads towards the disc and also prevent circumferential movement in response to the torque created by the revolving disc.

11. The other component (the bifurcated arms of the base piece), also guides the friction pads from above, so to speak, and prevents the friction pads from moving radially upward.

12. The pair of said components comprised of the two tooth-like members at opposite ends of the Caliper are axially spaced and in close relationship to the disc, that is to say, each pair includes two extensions which straddle the disc, and each of the extensions (a total, thusly, of four) has surfaces transverse to the direction of rotation of the disc and complementary to the transverse end portions of the friction elements.

13. One of the essential elements of a practicable disc brake assembly is a caliper or housing which provides a torque-taking surface. The friction pad removal problem is not necessarily related to the torque-taking function of the caliper, that is, one method may provide for removal by displacement of a torque-taking member while another method may provide for removal without displacement of such a member.

14. The '650 patent method includes the displacement of an end piece which also serves a torque-taking function in the circumferential direction, the major torque action created by the rotation of the disc.

### Conclusion of Law Regarding Validity of '650 Patent

Claim 13 of the '650 patent is valid.

### Discussion of Validity of '650 Patent

The dispute regarding the '650 patent centered, primarily, on the language of the claim which reads as follows: (Emphasis supplied).

". . . a stationary torque-resisting member having at least three *components* holding said friction elements from movement in a plane parallel to said disc, and at least *one of said components being displaceable* to permit removal of said friction elements in a plane parallel to said disc and a *pair of said components being held in axially spaced positions* on each side of and closely spaced from said disc and having surfaces transverse to the direction of rotations of said disc and placed complementarily to the transverse end portions of said friction elements to guide said elements at their opposite ends in movement to and from said disc and to restrain said elements from circumferential movement parallel with said disc; . . ."

Difficulty arises in the definition and identification of the word "components" and the subsequent combinations of components into "pairs." In the file wrapper, the three components are identified as the displaceable bridge piece at one end of the caliper, the legs of the other end of the caliper and the arms of the bore piece or caliper which are outside of the periphery of the disc (the top of the box, so to speak). This identification is accepted by plaintiff and its experts throughout.

The defendant contends that once having identified the components, the plaintiff cannot subsequently change or alter the components or combine them or portions of them to produce another component. Thus, it is asserted *no pair* of the identified components are "axially spaced" resulting in the failure of the patent to read on itself or, alternatively, then the language is so vague and indefinite as to invalidate the patent.

The plaintiff's response to this attack is the contention that the pair of axially spaced components consist of the two legs of the displaceable component (one leg on each side of the disc) and the two legs of the opposite end of the caliper (also one leg on each side of the disc).

In brief, that a portion of one of the identified components (the two legs) and a portion of another component (two legs) comprise a pair of axially spaced components.

At the very least, the language is so imprecise that it requires more than mere perusal of the claim itself and requires an analysis of the specifications and the exemplification of the preferred form.

Firstly, it is to be noted that the claim itself gives some assistance in comprehending the problem when it describes the pair of axially spaced components as having surfaces transverse to the direction of rotation of the disc so as to guide the friction elements and so as to restrain them from circumferential movement. Going then to the specifications and the preferred form, the only members that could provide such surfaces and perform those functions would be the leg portions of the two ends of the caliper, one a displaceable end.

Bearing in mind the presumption of the validity of a patent, it is apparent that the claim language, with recourse to the specifications and the preferred form, can be found to describe and disclose adequately the patented invention. With the caveat, however, that in order to avoid the fatal criticism of the defendant's position, the result is the restriction of the language of the claim to the parameters of the disclosure.

This restriction is not a subtle implication imposed indiscriminately, for the Patent Office itself was faced with a limitation of the scope of this patentable feature when it considered and rejected Claim 20. Claim 20 included the following language in lieu of "components" or "pair of components."

". . . and an *element* to hold said friction elements from movement in a plane parallel to said disc, and detachably secured to the housing to permit said friction elements to be removed from said housing in a plane parallel to the plane of said disc."

The logical inference is that the rejection of a displaceable "element" was based on the overbroad scope of the term, the failure to conform to the previous disclosures of the patent and the similarity of prior art.

It appears to this Court that the essence of the invention is the provision for a displaceable member which is a working portion of the caliper and is integral to the torque-taking function, but allows the removal of an end piece which does not disturb the power sides of the unit. To attempt, therefore, to obtain a patent which would cover all pad removal methods, particularly in view of prior art, would not only extend the scope of the disclosures, but would also result in the patenting of a principle.

Unfortunately, recourse to a dictionary is not helpful in this area since the definition of "component" as a "constituent part of" connotes severability or separate members forming a whole and "elements" as a "part of a whole" connotes "irreducible simplicity" or unseverability. (See Webster's 7th New Collegiate Dictionary.)

Another aspect of the essence of the invention is apparent from the language of the claim. It will be remembered that the claim language provides for a stationary *torque-resisting member having at least three components* and that later in the claim the pair of axially spaced components are described as having transverse surfaces to restrain the friction elements from circumferential movement, to take torque in other words. This serves to strengthen the conclusion that the essence of the invention is as previously set forth, that, simply put, the inventor had devised a means to remove the pads by displacing an end portion of the torque-taking housing.

Considering, then, the analysis above with the innate limitations of the scope of the claim, it appears to the Court that the prior art does not affect the validity of the patent, that the original disclosure would permit the addition of Claim

13 and that language of the claim is subject to fatal attack neither as to failure to disclose nor as to vagueness or indefiniteness.

▮ The defendant has vigorously contended that the '650 patent is invalid under the "late claiming" doctrine enunciated in Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). In a subsequent consideration of the *Muncie Gear* decision by the Court of Appeals for the Sixth Circuit, then Circuit Judge Potter Stewart stated the essence of the "late claiming" doctrine in Coats Loaders & Stackers, Inc. v. Henderson, 233 F.2d 915, 923 (6th Cir., 1956):

"The ultimate question is: was the invention which is now claimed disclosed in the original application, or was it not disclosed until the amendment . . . ?"

Given the restrictive reading which is necessary to sustain the validity of the '650 patent, the Court finds the necessary disclosure in the original application.

*Infringement of '650 Patent*

1. The accused brake method includes the displacement of two spring clips on top of the housing but not integral to the housing, which spring clips serve a torque-taking function in a radially outward direction, a minor, if not minimal, torque action created by the rotation of the disc.

2. The accused brake uses the ends of the caliper as guiding and torque-taking surfaces similar generally to the use of the ends of the '650 caliper.

3. The friction members of the accused brake have backing plates which are elongated and which have, on the top ends, ears which fit into and ride on ledges formed into the ends or bridge pieces of the caliper. The ears are held down by the spring clips which are attached to the caliper ends by screws.

4. The accused brake is entirely open on the top and the friction pads may be removed by unscrewing the spring clips from the caliper. The pads are thus removed radially and outwardly in a plane parallel to the disc.

*Conclusion of Law Regarding Infringement of '650 Patent*

The accused brake does not infringe upon the '650 patent.

*Discussion Regarding Infringement of '650 Patent*

In attempting to meet its burden on the infringement issue of the '650 patent, it was necessary for plaintiff to attempt comparison of two wholly different structures. The discussion regarding validity of the '650 patent is inextricably bound to the discussion of infringement since the understanding of the *scope* of the '650 patent is indispensable to the attempted application of its teachings to the accused brake.

An indication of the difficulty of the inartful use of the word "components" appears in the difference between the response of plaintiff to an interrogatory and the preference of its expert witness in identifying the comparable components of the accused brake. In the answer to interrogatory 56, plaintiff identified three components of the accused brake, i. e., 1) the two spring clips, 2) the two ledges, and 3) the combination of the four shoulders on one *side* of the caliper and the four shoulders on the opposite *side* of the caliper. Plaintiff's expert described four components, i. e., 1) the two spring clips, 2) the ledges, 3) the four shoulders on one *end* of the caliper, and 4) the four shoulders on the other *end* of the caliper.

Under either approach, of course, it would be necessary to combine portions of the identified components in order to conclude with a new pair of components which are axially spaced on each side of the disc.

However, the major distinctions between the two devices are obscured by the use of the inconstant word "component." As has been emphasized, the cal-

iper in this type of brake is the torque-taking element and, certainly, is recognized as such in both the patent and the accused brake. There is nothing novel or patentable in that respect in the '650 patent. The '650 patent does teach the displacement of a portion of that torque-taking caliper for removal of the friction pad. The claim of infringement does not go to the similarities of the torque-taking methods, but to the removal process.

Distinctive contrasts that reach compelling proportions are created in the two devices, for example, in the members that are displaced to effectuate removal, the function of those members, the accessability of the pads and the place and direction of the removal. Most importantly, in the '650 patent the removal requires the displacement of an integral end of the caliper, the predominent torque-taking device, whereas in the accused brake, removal requires the displacement of two spring clips which serve little torque-taking function. The clips are attached to, but not integral to the top of the caliper.

Granted this determination of non-infringement depends heavily on the propriety of the determinations made with regard to the validity issue, but again confirmation is found in the attitude of the Patent Office illustrated by its rejection of Claim 20; for Claim 20, which called for a displaceable "element" would have prompted a contrary result.

### The '809 Patent

Further development of the disc brake concept eventually resulted in another form which is commonly referred to as the "sliding" or "floating" caliper disc brake. The fixed caliper brake (the type involved in the prior three patents in suit) consists of pistons and friction pads on each side of the disc and an inert or stationary caliper. The hydraulic pressure is exerted in both sides of the caliper, forcing the opposing pistons against the pads which pinch the disc. The caliper itself is affixed to a stationary member of the wheel assembly.

The sliding caliper brake has a piston on one side only of the caliper and hydraulic pressure is exerted on one side only, forcing the piston against one friction pad and that pad against one side of the disc. The action of the extension of the piston causes a "re-action" which forces the entire caliper to slide and brings the opposing friction pad into contact with the opposite side of the disc to create the pinching effect. Thus, the caliper itself is not stationary but must slide on an additional member which in turn is affixed to a stationary portion of the wheel assembly.

The '809 patent concerns special anchoring and locating members which permit the sliding movement of the caliper with the assurance of proper brake application.

The preferred form of the '809 patent begins with a substantially flat member in the form of a horseshoe. The closed end of the shoe is affixed to a non-rotating part of the wheel assembly and provides the support and ultimate torque-taking service. Each of the extended ends of the horseshoe has holes or bosses through which is inserted a pin. The caliper is also U-shaped and rides in a plane perpendicular to and within the exposed area of the support member. It is constructed so that the piston side of the caliper has ears with corresponding holes that slide onto and ride on the pins aforedescribed. The friction elements are constructed so that the metal backing plate members have ears with corresponding holes that also slide onto and ride on the pins. The outer ends of the pins are secured by a metal member, which is a separate piece and improves the rigidity of the structure.

As to the '809 patent, the defendant again claims that there is no infringement and asserts the invalidity of the patent because of prior art not considered by the Patent Office.

*Infringement of '809 Patent*

The major area of dispute under the infringement issue is represented by Claim 5 of the patent, which reads as follows:

"In a disc brake including a rotatable disc, the structure comprising a nonrotatable supporting framework comprising a substantially flat support member having two radially extending outwardly projecting limbs forming a notch therebetween disposed alongside said brake disc adjacent one of the radially extending side faces thereof, a pair of combination axially fixed anchoring-and-locating members one on each of said limbs which are angularly spaced apart and extending axially to provide torque-taking surfaces located 'along one side only of said disc and disposed closely adjacent thereto, a pair of friction elements having means providing slidable support relatively to said anchoring-and-locating members disposed one on each side of said disc to be engageable with opposite braking surfaces of said disc, one of said friction elements consisting of an elongated friction liner and backing having slidable torque-taking remote ends adapted to operatively transmit anchoring thrust to said support member through angularly spaced complementary locations disposed closely adjacent said disc and located adjacent said pair or combination anchoring-and-locating members, a rigid caliper carried by said anchoring-and-locating members and proportioned to be positioned between the said anchoring-and-locating members and having surfaces adapted to be complementary with said torque-taking surfaces and slidably supported thereby at one side of said rotatable disc, said caliper having a pair of limbs straddling the said periphery of the disc, a brake applying mechanism supported by one limb of said caliper and arranged to be operated to press the friction element associated therewith toward the disc and the other limb disposed in operative engagement with the other friction element to move it toward the disc under the reaction set up on the caliper by said brake applying mechanism as said other limb is drawn toward said anchoring-and-locating members, said other friction element being disposed between said other limb and the associated side of said disc, said caliper being freely movable in an axial direction relative to said anchoring-and-locating members and positively located radially and circumferentially with respect to said friction elements."

1. In the preferred form of the '809 patent, the initial torque is taken by the friction member adjacent to the piston-side of the caliper and transmitted through the ears of the backing plate to the pins. Almost simultaneously the opposing friction member contacts the opposite side of the disc and the torque received is transmitted to the pins through its backing plate ears. Because of the connection obtained by its contact with this friction member, the caliper itself transmits the torque it receives through its ears on the piston-side to the same pins.

2. The torque obtained by the pins is then transmitted to the inner surfaces of the bosses or holes of the flat, stationary torque member.

3. In the accused brake, a horseshoe-shaped member is provided which is affixed to a stationary member of the wheel assembly.

4. Each of the two open ends of the horseshoe have bosses or holes and are also notched.

5. The caliper of the accused brake has corresponding holes. Pins are inserted through the caliper holes and the torque plate ends to provide the sliding surface. As a part of this assembly, flex straps are also provided, one end of each is affixed to the torque plate and the other end is connected to the pin.

6. Neither of the friction members has any connection to or contact with the pins, nor do the pins extend beyond the periphery of the disc.

7. The piston side of the caliper is machined so as to provide areas which fit into the notches of the open ends of the torque plate and abut the surface of those notches.

8. The piston-side friction member includes a backing plate which is guided in and by raised portions or shoulders of the torque plate. This backing plate has hook-like extensions or ears which are supported by and ride on these raised portions of the torque and are also inhibited by spring clips.

9. The opposing friction member is affixed to the opposite extensions of the caliper by screws or bolts and notches.

10. The initial torque is taken by the piston-side friction member via its backing plate and transmitted directly to the torque plate. Almost simultaneously the opposing friction member makes contact with the disc and that torque is transmitted to the caliper. This latter torque travels through the caliper, so to speak, and is transmitted from the caliper to the torque plate at the notching connections.

11. Because of the notching connection between the torque plate and the caliper, the pins supplying the sliding surface have no or minimal torque-taking or transmitting function.

12. Defendant's accused sliding caliper brake does not have "a pair of combination axially fixed anchoring-and-locating members one on each of said members which are angularly spaced apart and extending axially to provide torque-taking surfaces, located along one side only of said disc and disposed closely adjacent thereto" as called for in Claims 5–8 of the '809 patent. In defendant's accused brakes the anchoring and the locating or guiding functions are performed by separate and different structures. The anchoring is done by shoulders which engage surfaces on the caliper to anchor the caliper against rotative movement and to take the torque. The locating or guiding function is performed by pins which slide in the torque plate and are not axially fixed and do not take torque and by metal flex straps which flex axially and do not take torque.

13. In defendant's accused sliding caliper brake the caliper is not "carried by said anchoring-and-locating members" as called for in Claims 5–8 of the '809 patent, but is carried by the pins and flex straps which are not "combination anchoring-and-locating members."

14. In defendant's accused sliding caliper brakes there are no "means providing slidable support" for both friction elements as called for in Claims 5–8 of the '809 patent because one of the friction elements is fixedly mounted in the caliper and does not slide on any supporting structure such as pins as used in the '809 patent brake.

15. In defendant's accused sliding caliper brakes the caliper is not "freely movable in an axial direction relative to said anchoring-and-locating members" as called for in Claims 5–9 of the '809 patent because defendant's caliper is located and guided by pins and metal flex straps fixed to it which are movable relative to the torque plate and the caliper cannot move until it overcomes the resistance to movement offered by the flex straps and the rubber grommets which surround the pins.

16. Defendant's accused sliding caliper brakes do not use substantially the same structure to accomplish substantially the same results in substantially the same way as the '809 patent brake.

17. All of the mechanical elements called for in Claims 5–8 of the '809 patent are not present in defendant's accused sliding caliper brake.

### Conclusion of Law Regarding Infringement of '809 Patent

The accused sliding caliper brakes do not infringe Claims 5–8 of the '809 patent.

### Discussion Regarding Non-Infringement of '809 Patent

The specificity of the Findings of Fact relating to the '809 patent infringement issue do not require exten-

sive discussion. The most liberal interpretation of the '809 patent does not serve to bring the accused brake within the ambit of the claim language.

The '809 patent, as is evident from the testimony and prior art references, does not purport to be the mother invention of the sliding caliper brake concept, nor the first to use pins as the mode of the sliding surface. The improvements asserted on behalf of the '809 patent do not find response in the accused brake. The original taking of the torque and the transmittal methods, for example, are entirely different and, in fact, the accused brake compares more proximately to the Chouings brake in those particulars than the '809 patent. Thus, the infringement issues should be read in light of the findings and discussion of the validity issues following.

Again, it is to be noted that the Court was more impressed with the testimony of defendant's experts and the pragmatic reasonableness of their approach and explanation.

### Validity of '809 Patent

The defendant claims that the '809 patent is invalid and bases its attack on the prior art illustrated by British Patent No. 717,350 (the Chouings Patent), U. S. Patent No. 3,081,841 (the Dotto Patent), U. S. Patent No. 3,260,332 (the Wells Patent), an article in the October 8, 1952, issue of "The Motor Magazine" and several other U. S. patents, none of which were considered by the U. S. Patent Office prior to the issuance of the '809 patent.

1. In the Chouings Patent preferred form there is described a substantially flat, horseshoe-shaped torque plate which is affixed to a stationary part of the wheel assembly; the torque plate open ends are provided with holes or bosses and notches; the U-shaped caliper has corresponding holes on each side of its limbs which permit the entry of pins through the holes in the caliper and the bosses of the torque plate; the piston side friction member is guided and supported in the notches of the torque plate; the opposite friction member is attached to the opposide side of the caliper by means of notches and bolts; there is no connection between the respective friction members and the pins; the caliper, however, is slidably supported and guided by the pins.

2. In the Chouings Patent, the piston side friction member accepts torque and transmits it directly to the torque plate; the opposite friction member, being affixed to and riding within the confines of the caliper, transmits the torque directly to the caliper, which in turn, transmits to the pins and through them to the torque plate.

3. The claims of the '809 patent read equally well on the Chouings patent and the accused brake.

4. In the Dotto patent, there is provided a substantially flat torque plate in a general U-shape with one end affixed to a stationary part of the wheel assembly; on the piston side, the torque plate's open ends have two holes in each end; the outer holes are used to connect that torque plate to the extending portions of a metal member on the opposite side of the disc which is also U-shaped but is not otherwise affixed to any stationary part of the wheel assembly; the inner holes correspond to holes in the caliper and pins are used through these holes to provide slidable support for the caliper; the piston side friction member rides in the grooves or notches of the piston side torque plate while the opposite friction member rides in the grooves of the opposite connected or annexed metal member; on the piston side, torque is transmitted directly from the friction member to the torque plate; on the opposite side, torque is transmitted directly to the annexed torque member and is borne by the bolt connection of the combination torque plate; the inner pins allow the caliper to slide, but do not provide any torque-taking or transmitting function.

5. The Dotto prior art United States Letters Patent No. 3,081,841 which issued on March 19, 1963, discloses a disc

brake structure which is closer in mode of operation and function to the '809 patent in suit than is defendant's accused brake, and if Claim 5 of the '809 patent is interpreted broadly enough to cover the brake disclosed in the '809 patent and to cover defendant's accused sliding caliper brake then all of the mechanical elements called for in Claim 5 of the '809 patent are present in the Dotto prior art brake.

6. The additional prior art offered by the defendant in support of its claim of invalidity, also finds appreciable response in the '809 patent in suit.

*Conclusion Regarding Validity of '809 Patent*

The '809 patent is invalid under 35 U.S.C. § 102(a), (b), or § 103.

*Discussion Regarding Validity of '809 Patent in Suit*

Comparisons between the '809 patent, the accused brake, the Chouings patent and the Dotto patent, along with other prior art references, convince this Court that had the Patent Office considered the prior art it could not have found the '809 offering patentable and further, that the accused brake finds more appropriate response to the prior art.

The Chouings prior art, particularly, reads very closely on the accused brake. It is of interest to note that although plaintiff's British and American patent personnel discussed the Chouings patent, it was not brought to the attention of the U. S. Patent Office.

The major distinction drawn by the plaintiff in rebuttal of defendant's contention of the Chouings patent, was the axial extension of the holes or bosses at the open ends of the torque plate. The claimed import of this distinction is that the lack of axial extension permitted a tilting action which resulted in improper friction pad application and wear. Plaintiff further contends that an ex parte test of the Chouings, '809 brake and the accused brake indicated the disadvantages of the tilting movement of the Chouings brake.

It is apparent from a reading of the Chouings patent that this tilting movement was looked upon as an advantage by the inventor because it purportedly allowed an adjustment to variations of the disc. The patent describes the holes in the torque plate (or bracket as referred to in the patent) to be of "only a very short length" to allow the tilting. Thus, the inference can be drawn readily and reasonably that the inventor was particularly concerned with the thickness or "axial extension" of the surface of these holes and specifically opted for "short" holes in order to provide for the tilting action that he saw advantageous. The converse of that seems obvious: the longer the length of the holes, the less tilting. It is a simple step to increase the "axial extension" of the holes or bosses to the point of minimal or no tilting, the result and advantage claimed by the plaintiff '809 patent.

Had the Chouings patent made no reference to the extent of the surface of the holes or bosses, the position of plaintiff would have been more palatable as it relates to the tilting action. The specific emphasis placed on the "very short length" of the surface of the hole so as to provide tilting, however, rebounds against plaintiff's strongly asserted position and dictates the obvious conclusion that different surface extensions will affect tilting action. This can be easily accomplished by providing a thicker torque plate or by thickening in some fashion a portion of the open ends of the torque plate.

The argument of plaintiff that the effect of the "short length" holes is to provide torque-taking "edges" as opposed to torque-taking "surfaces" as exemplified in the '809 patent is hardly significant. The point is that the surface of the holes take the torque; the axial extension of the holes determines the tilt or lack of it.

Plaintiff asserts with regard to the applicability of the Dotto prior art patent that the Dotto construction does not include a "flat" torque plate so as to provide an advantageous air cooling of

the friction pads. There has been a general assumption throughout the trial that a major advantage of the disc brake is the open construction which permits the heat to dissipate easily and quickly. The Court readily grasps the contribution to this advantage by virtue of the size of a disc brake and the fact that it contacts and has relationship to a portion only of the disc. However, the Court was not apprised of the significance in the heat-dissipation area by virtue of different constructions; e. g., does the construction of Dotto in fact of theory significantly reduce the ability to air cool the friction pads as compared to the '809 patent? Granted it is obvious that the more open the construction is, the more the air that can reach the pads, but lacking testimony on the subject, this Court is not prepared nor competent to speculate on the degrees of difference and ultimately the effects on improvement or detriment. Thus, the disadvantage, in Dotto, of having the one side of the combination torque plate covering a portion of the outer periphery of the disc is apparent; however, whether this disadvantage affects the workability and efficiency of the Dotto brake is not evident nor reasonably inferable in this record.

The dispute as to the applicability of Dotto, then, concerns two subjects; i. e., the lack of mechanical or bonding connection between the pad and its backing plate, and the torque-taking elements.

With regard to the connection between pad and backing plate (which may affect the method of torque acceptance and transmittal) this Court finds it difficult to differentiate between a mechanical or bonding connection (e. g. by adhesives) and the connection developed by the application of pressure created by hydraulic or some other activating force. Further, if there is a difference, it appears obvious that a mechanical or bonding connection would hardly be of patentable novelty.

With regard to the torque-taking apparatus, plaintiff contends that while the piston side of the torque plate may be flat in Dotto as called for in the '809 patent, the annexation of the straddling member which extends on the opposite side of the disc not only destroys the flatness element but results in torque being taken on the opposite side of the disc and not to and through the pins.

If the flatness element is of such vital significance to the '809 patent, then the Court fails to follow the argument of plaintiff that the torque plate of the accused brake is "substantially flat" and reads on the '809 patent. It is inconsistent to minimize the shoulders or flanges of the torque plate used by defendant which support and guide the friction members and emphasize the configuration of the Dotto combination or annexed torque plate.

The testimony of plaintiff's expert, Fishley, was equivocal as to the torque transmission method and pattern of the Dotto brake. There was uncertainty regarding the torque-taking potential of the annex portion of the torque plate, the role of the pins connecting the two portions and the potential of the "unified" torque plate. Suffice it to say, the pins or bolts connecting the Dotto torque plate appear to carry a substantial burden in the torque-taking process and are, thereby, closely akin to the function and contribution of the pins in the '809 patent.

### Discussion Regarding Other Claims

The defendant in its counterclaim has also claimed that the patents in suit are unenforceable because of plaintiff's unclean hands, misuse of the patents and violations of antitrust laws and that the violation of antitrust laws entitle defendant to treble damages based on its attorneys' fees and costs.

In view of the Court's decision as to the validity and infringement issues, the enforceability of the patents in suit becomes a moot question.

As to the alleged violation of antitrust laws, the Court does not consider that the defendant has met its burden of proof in that regard.

It is not, of course, uncommon for allegations to be made in lawsuits for the purpose of tainting the conduct and bona fides of one's opponent. In the case at bar, such innuendos were indulged in by both sides, e. g., the inference that the defendant acquired trade secrets or technical knowledge from plaintiff that permitted it to modify its structures, albeit unsuccessfully, to avoid infringement; the inferences that plaintiff, on the other hand, withheld information regarding Goodyear activity. Such inferences and innuendos, however, did not rise to the standard of proof requisite to establish any equitable doctrines or violation of antitrust statutes.

Therefore, the Court will deny the request of the respective parties for treble damages and awards of other than statutory attorney fees.